1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7    ANDY CRUZ GOMEZ,                    Case No. 3:23-cv-06608-WHO

8                   Plaintiff,
                                         **ORDER ON MOTIONS TO DISMISS,**
9          v.                            **STRIKE, AND COMPEL**
                                         **ARBITRATION**
10   NEW CHAMPION PROMOTIONS, LLC,
     et al.,                             Re: Dkt. Nos. 50, 52, 53
11                  Defendants.

12

13          Plaintiff Andy Cruz Gomez ("Cruz") is a professional boxer and Olympic gold medalist.

14   He filed this lawsuit against the defendants New Champion Promotions, LLC ("NCP") and Jesse

15   Rodriguez (collectively, "the NCP defendants"), as well as Matchroom Boxing USA, LCC

16   ("Matchroom"), alleging that they violated federal and state laws that protect professional boxers

17   from predatory promoters and managers, among other alleged legal violations.  The NCP

18   defendants moved to dismiss and moved to strike several requests for relief, and Matchroom

19   moved to compel arbitration.  For the following reasons, the motion to dismiss is granted in part

20   and denied in part, with leave to amend.  The motion to compel arbitration is granted as to the

21   claims filed against Matchroom, which will be stayed pending arbitration, and denied as to the

22   claims against the NCP defendants.

23                              **BACKGROUND**

24   I.     **FACTUAL BACKGROUND**

25          Cruz's operative Second Amended Complaint was filed against the NCP defendants,

26   Matchroom, and 25 Doe defendants.  ("SAC") [Dkt. No. 48].  As relevant, he alleges the

27   following.

28          Cruz is a professional boxer from Cuba.  *Id.* ¶¶ 1–2.  He won the gold medal at the

*United States District Court*
*Northern District of California*

2020/2021 Olympics in Tokyo. *Id.* ¶ 2. He left Cuba in 2022 to turn professional. *Id.*

In November 2022, Cruz entered a Spanish language promotional agreement with NCP for NCP to "to put on professional boxing matches" featuring Cruz, and to pay Cruz for the matches. *Id.* ¶ 3. NCP did not promote any matches featuring Cruz and instead "took" Cruz to Matchroom, one of the largest boxing promotional companies in the world. *Id.* ¶¶ 4–5. In May 2023, Cruz, the NCP defendants, and Matchroom executed a promotional agreement for Matchroom to put on professional boxing matches featuring Cruz. *Id.* ¶ 6. Cruz attached the original Spanish language promotional agreement as well as an English language translation to the AC. ("Contract") [Dkt. No. 48] Ex. A. In that contract, Cruz is the "Fighter" and NCP is the "Promoter." *Id.* at p.1.

That agreement provides that Matchroom will pay a "Signing Bonus" of $250,000, which "shall be released to the Promoter/Fighter" in three portions. *Id.* § 5.1. It also provides that Matchroom will put on four bouts in the first year, with purses of $125,000, $150,000, $175,000, and $200,000 for each subsequent bout. *Id.* § 6.1. The Contract contemplates the withholding of taxes. *Id.* § 8.1. It also provides that the purses "shall be payable by Matchroom to the Promoter [NCP] and as directed by the Promoter [NCP], to Fighter [Cruz] within five (5) days of the conclusion of each Bout . . ." *Id.* § 8.2.

Cruz alleges that Matchroom timely paid NCP the first $125,000 of the Signing Bonus but that NCP paid only $94,340 to Cruz. SAC ¶ 13. Then Matchroom timely paid NCP the next $62,500 of the Signing Bonus as well as $105,750 for Cruz's Bout 1 (minus taxes), but of that total $168,250, NCP paid Cruz only $124,195. *Id.* ¶¶ 14–15. Cruz then alleges that Matchroom paid $62,500 for the final portion of the Signing Bonus but he received only $27,750. *Id.* ¶¶ 17–20.[1] Then, Matchroom paid the Bout 2 purse in part directly to Cruz and in part through NCP, and Cruz alleges that NCP wrongfully withheld $15,000 from this payment to him. *Id.* ¶¶ 21–22.

In total, Cruz asserts that NCP wrongfully withheld about $124,465 that he was entitled to under the contract. *Id.* ¶ 24. He says that there was no contractual basis for this withholding. *Id.* ¶ 25.

---

[1] He alleges that Matchroom paid *him* the $62,500 tranche, AC ¶ 17, but this must be a typo because he goes on to assert that NCP deducted from the $62,500 before paying him.

2

1    The AC asserts ten causes of action against the defendants: (1) violation of the provision of
2  the Muhammad Ali Boxing Reform Act of 2000 (the "Ali Act") that creates a "firewall" between
3  managers and promoters, 15 U.S.C. § 6308, SAC ¶¶ 66–77; (2) violation of the disclosure
4  requirement of the Ali Act, 15 U.S.C. § 6307e(b), SAC ¶¶ 78–86; (3) violation of California state
5  licensing law for boxing managers, Cal. Bus. & Prof. Code §§ 18628, 18642, SAC ¶¶ 87–104;
6  (4) breach of contract, SAC ¶¶ 105–30; (5) breach of the covenant of good faith and fair dealing,
7  *id.* ¶¶ 131–58; (6) breach of fiduciary duty, *id.* ¶¶ 159–65; (7) conversion, *id.* ¶¶ 166–71;
8  (8) accounting, *id.* ¶¶ 172–76; (9) declaratory relief, *id.* ¶¶ 177–80; and (10) violation of New
9  York state law concerning compensation of boxers, N.Y. Comp. Codes R. & Regs. tit. 19,
10  § 209.13.

11  **II.    PROCEDURAL BACKGROUND**

12    Cruz filed this lawsuit in December 2023.  [Dkt. No. 1].  The NCP defendants moved to
13  dismiss his amended complaint, and I granted the motion in a minute order with leave to amend.
14  ("Prior Order") [Dkt. No. 42].  Cruz filed the operative SAC in June 2024.  [Dkt. No. 48].

15    The NCP defendants filed a motion to dismiss and strike.  ("MTD") [Dkt. Nos. 52, 53[2]].
16  Cruz opposed.  ("Oppo. MTD") [Dkt. No. 57].  The NCP defendants replied.  ("Repl. MTD")
17  [Dkt. No. 59].

18    Matchroom filed a motion to compel arbitration.  ("Mot. Compel") [Dkt. No. 50].  Cruz
19  opposed.  ("Oppo. Compel") [Dkt. No. 55].  The NCP defendants filed a notice of non-opposition.
20  [Dkt. No. 56].  Matchroom replied.  ("Repl. Compel") [Dkt. No. 58].  I held a hearing at which
21  counsel for all parties appeared.

22                          **LEGAL STANDARD**

23  **I.    MOTION TO DISMISS**

24    Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint
25  if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to
26  dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its

27

28  ───────────────
[2] It appears the NCP defendants each filed an identical motion to dismiss, rather than filing the one
motion jointly.

United States District Court
Northern District of California

1   face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when

2   the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant

3   is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation

4   omitted).  There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

5   While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts

6   sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

7        In deciding whether the plaintiff has stated a claim upon which relief can be granted, the

8   Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the

9   plaintiff.  *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court

10  is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of

11  fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir.

12  2008).

13       If the court dismisses the complaint, it "should grant leave to amend even if no request to

14  amend the pleading was made, unless it determines that the pleading could not possibly be cured

15  by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  In making

16  this determination, the court should consider factors such as "the presence or absence of undue

17  delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments,

18  undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport*

19  *Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

20  **II.     MOTION TO STRIKE**

21       Federal Rule of Civil Procedure 12(f) provides that a court "may strike from a pleading an

22  insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R.

23  Civ. P. 12(f).  The function of a motion to strike under Rule 12(f) is to avoid the expenditure of

24  time and money that must arise from litigating spurious issues by dispensing of those issues before

25  trial. *See Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*,

26  510 U.S. 517 (1994) (citation omitted).   Motions to strike "are generally disfavored because they

27  are often used as delaying tactics and because of the limited importance of pleadings in federal

28  practice." *Rosales v. Citibank*, 133 F. Supp. 2d 1177, 1180 (N.D. Cal. 2001).  In most cases, a

United States District Court
Northern District of California

1     motion to strike should not be granted unless "the matter to be stricken clearly could have no

2     possible bearing on the subject of the litigation." *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F.

3     Supp. 2d 1048, 1057 (N.D. Cal. 2004).

4     **III.     MOTION TO COMPEL ARBITRATION**

5          The Federal Arbitration Act ("FAA") governs the motion to compel arbitration.  9 U.S.C.

6     §§ 1 et seq.  Under the FAA, a district court determines (1) whether a valid agreement to arbitrate

7     exists and, if it does, (2) whether the agreement encompasses the dispute at issue.  *Lifescan, Inc. v.*

8     *Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004).  "To evaluate the validity of

9     an arbitration agreement, federal courts should apply ordinary state-law principles that govern the

10    formation of contracts."  *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003)

11    (internal quotation marks and citation omitted).  If the court is satisfied "that the making of the

12    agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an

13    order directing the parties to proceed to arbitration in accordance with the terms of the agreement."

14    9 U.S.C. § 4.  "Any doubts concerning the scope of arbitrable issues should be resolved in favor of

15    arbitration."  *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999).  "[W]here . . . the

16    formation and validity of the contract is not at issue, and the parties "have agreed to arbitrate some

17    matters pursuant to an arbitration clause, . . . any doubts concerning the scope of arbitral issues

18    should be resolved in favor of arbitration."  *Columbia Exp. Terminal, LLC v. Int'l Longshore &*

19    *Warehouse Union*, 23 F.4th 836, 847 (9th Cir.) (citation omitted).

20                                              **DISCUSSION**

21    **I.     MOTION TO DISMISS AND STRIKE**

22         **A.     Claims Arising Under the Ali Act**

23         Cruz asserts two claims arising under the Ali Act.  The Ali Act was passed in 2000 to

24    "address certain troubling business practices within the industry," including the often-predatory

25    relationship between high-powered, wealthy, influential boxing promoters and the boxers

26    themselves, who usually "have limited educational backgrounds [and] . . . are no match for

27    experienced promoters during contractual discussions."  *Franklin v. Haak*, No. 19-10137, 2020

28    WL 344848, at *4–5 (E.D. Mich. Jan. 21, 2020) (first quoting *Muhammad Ali Boxing Reform*

United States District Court
Northern District of California

*Act: Hearing on S. 2238 Before the S. Comm. On Commerce, Sci., and Transp.*, 105th Cong. 16 (July 23, 1998) ("S. Hearing"); and then quoting the Senate Report of the Ali Act, S. Rep. No. 106-83, at 11 (1999) ("S. Rep.")).  As explained at the Senate hearings, "There is a definite conflict of interest between the fighter and his promoter . . . The job of the promoter is to go out and get as much money as he possibly can get from television, from the site, from foreign rights, from sponsorships, etc., and then to pay the fighter as little as he possibly can.  The reason for this is the difference goes to the promoter." *Id.* at \*5 (quoting S. Hearing, 105th Cong. 9).  The manager is supposed to be the balance—"Typically managers . . . are paid based upon a percentage of the boxer's purse." *Id.* (quoting S. Hearing, 105th Cong. 28).  "[I]t [is] essential that managers . . . serve and protect the interests of the boxer . . . . It is not plausible for a boxer to receive proper representation and counsel from a manager if the manager is also on the payroll of a promoter." *Id.* (quoting S. Rep. No. 106-83, at 11).  For that reason, the Ali Act imposes a "firewall" between promoters and managers, to protect boxers from predatory situations.  *See* 15 U.S.C. § 6308(b)(1).

### 1.    Firewall Provision

It is this firewall provision that is the basis for Cruz's first claim.  As relevant, the provision provides:

> (b) Firewall between promoters and managers
> (1) In general
> It is unlawful for--
> (A) a promoter to have a direct or indirect financial interest in the management of a boxer; or
> (B) a manager--
> (i) to have a direct or indirect financial interest in the promotion of a boxer; or
> (ii) to be employed by or receive compensation or other benefits from a promoter, except for amounts received as consideration under the manager's contract with the boxer.

15 U.S.C. § 6308(b)(1).[3]

Section 6309 provides a private right of action to enforce the Ali Act.  *See id.* § 6309.  To

---

[3] This firewall provision "only applies to boxers participating in a boxing match of 10 rounds or more."  15 U.S.C. § 6308(b)(2)(B).  I accept the parties' representation at argument that Cruz's matches were all 10 rounds or more.

United States District Court
Northern District of California

1    state a claim for violation of a provision of the Act, the boxer must allege "(1) economic injury to

2    the boxer (2) as a result of the violation." *Saunders v. GFS Ent. Grp., LLC*, No. CV 16-1062,

3    2017 WL 5712312, at \*3 n.2 (W.D. Pa. Nov. 28, 2017) (citing *Main Events Prods., L.L.C. v. Lacy*,

4    358 F. Supp. 2d 391, 396 (D.N.J. 2004)).

5         The threshold issue is whether this provision even applies to the NCP defendants, who say

6    they were promoters with no financial interest in Cruz's management. But according to Cruz—

7    and the statutory and case history of the Ali Act—*managers* are typically paid as a percentage of

8    the boxer's purse, to incentivize them to prioritize the boxer's interests. *See* SAC ¶¶ 70–73;

9    *Franklin*, 2020 WL 344848, at \*5. And here, Cruz plausibly alleges that the NCP managers were

10   paid as a percentage of his purse, as they deducted a certain percentage from each of his payments

11   before giving him the rest. *See* SAC ¶¶ 69, 72. His theory, then, is that being paid from his purse

12   inherently gave the NCP defendants a financial incentive in his management, which makes sense

13   given that is precisely why *managers* are paid as portions of boxer's purses. *See also supra*

14   Section I.B. (describing definition of boxing manager under California law). He therefore

15   plausibly alleges that the NCP defendants had a direct financial interest in his management, such

16   that 15 U.S.C. § 6308(b)(1) applies. The defendants' only counterargument is that they could not

17   have had a financial interest in his management because he had a manager, *see* MTD 5:1–24, but

18   someone else *also* having a financial interest in his management does not affect whether the

19   defendants had such an interest.

20        Cruz also pleads that this violation of the Ali Act caused him economic injury, *see*

21   *Saunders*, 2017 WL 5712312, at \*3 n.2, because he lost out on some of his own prize money.

22   Accordingly, he states a claim and the motion is DENIED on this basis.

23                        **2.      Disclosure Provision**

24        Second, Cruz argues that NCP and Rodriguez violated the Act's provision that requires

25   certain financial disclosures. SAC ¶¶ 78–86; Oppo. MTD 8:21–9:22. The provision provides in

26   relevant part:

27        (b) Disclosures to the boxer
     A promoter shall not be entitled to receive any compensation directly or indirectly
28        in connection with a boxing match until it provides to the boxer it promotes--

(1) the amounts of any compensation or consideration that a promoter has
contracted to receive from such match;
(2) all fees, charges, and expenses that will be assessed by or through the promoter
on the boxer pertaining to the event, including any portion of the boxer's purse that
the promoter will receive, and training expenses; and
(3) any reduction in a boxer's purse contrary to a previous agreement between the
promoter and the boxer or a purse bid held for the event.

15 U.S.C. § 6307e(b).

Again, § 6309 provides a private right of action to enforce the Ali Act.  *See id.* § 6309.  To state a claim for violation of the disclosure requirement via § 6309, the boxer must allege "(1) economic injury to the boxer (2) as a result of the violation."  *Saunders*, 2017 WL 5712312, at *3 n.2 (citing *Main Events Prods.*, 358 F. Supp. 2d at 396).  To state a claim for violation of § 6307e(b)(3), the plaintiff must plausibly allege that he "suffered economic injury as a result of the promoter's failure to disclose a reduction in the contracted purse."  *Id.*  In *Saunders*, the court explained that the plaintiff did not assert that his injuries arose from "a *failure to disclose*" when they arose from the cancelation of a bout.  *Id.*

Here, Cruz plausibly alleges that the NCP defendants were promoters but did not provide the required disclosures.  SAC ¶¶ 82–83.  And he plausibly alleges that he was economically injured by the NCP defendants' failure to disclose, at the very least, "any portion of the boxer's purse that the promoter will receive," 15 U.S.C. § 6307e(b)(2), because his alleged damages stem from his assertions that they received and retained portions of his purse without informing him. The defendants do not contest that this is enough to state a claim, and instead argue that they were not required to provide this information because it was Matchroom's responsibility as "lead promoter."  Oppo. MTD 6:1–17.  But they cite no law for support, and so I find this argument unconvincing.  Their motion is DENIED on this basis.

## B.     Cal. Bus. & Prof. Code § 18642

Cruz says that the NCP defendants violated California state law provisions that require boxing managers to be licensed by the state.  *See* SAC ¶¶ 87–104.  I previously told the parties to address whether Cruz can bring this claim under California law, given the contract's choice of New York law.  *See* Prior Order.  Cruz asserts that California boxing law governs all professional boxing activities within the state, and that he has had two bouts in California under the contract at

8

1   issue in this suit.  SAC ¶¶ 88–91.

2   California law defines a boxing manager as someone who "[r]eceives or is entitled to

3   receive more than 10 percent of the gross purse of any professional boxer . . . relating to such

4   person's participation in a professional contest."  Cal. Bus. & Prof. Code § 18628(c).  The

5   California State Athletic Commission licenses managers, and state law provides that "[n]o person

6   shall participate in any contest or serve in the capacity of a . . . manager. . . unless he or she has

7   been licensed for that purpose by the commission."  *Id.* § 18642.  Where a boxing contract fails to

8   meet this requirement, district courts have the power to declare the contract "unenforceable and

9   void."  *de la Hoya v. Top Rank, Inc.*, No. CV 00-10450-WMB, 2001 WL 34624886, at *9 (C.D.

10  Cal. Feb. 6, 2001) (citing *George Foreman Assocs., Ltd. v. Foreman*, 389 F. Supp. 1308, 1314

11  (N.D. Cal. 1974), *aff'd*, 517 F.2d 354 (9th Cir. 1975)).

12  Cruz states a claim for violation of this provision.  He alleges that the NCP defendants

13  received more than ten percent of his purse and so meet the statutory definition of a boxing

14  manager but are not licensed as such by the state.  SAC ¶¶ 99–102.  This is sufficient to plead that

15  the contract was written in violation of California state law and to serve as a basis for his request

16  that the contract is unenforceable and void.  *See de la Hoya*, 2001 WL 34624886, at *9.  The

17  defendants seem to ignore the allegations that they met the statutory definition of "manager" by

18  taking more than ten percent of Cruz's purse, and they make a nonsensical argument that tax

19  agencies and creditors would constitute boxing managers if Cruz's interpretation of the law were

20  correct.  *See* MTD 7:3–8:8.  I am unpersuaded.  Finally, they argue that the California State

21  Athletic Commission has "exclusive jurisdiction" over this claim but fail to cite supporting law

22  and fail to engage with the cases addressed above that found otherwise.

23  The motion to dismiss is DENIED on this basis.

24  **C.      N.Y. Comp. Codes, R., & Regs. tit. 19, § 209.13**

25  Cruz asserted a claim for violation of the New York state boxing regulations.  In relevant

26  part, the regulation provides:

27      All compensation to licensed professional boxers or mixed martial artists shall be
        paid by the promoter by check payable to the participating combatant, who shall
28      sign receipts for such payment, unless otherwise directed or authorized by the

United States District Court
Northern District of California

9

Commission. . . .  No payment shall be made to any person or party other than as set forth herein unless the Commission has approved the transaction.

N.Y. Comp. Codes R. & Regs. tit. 19, § 209.13.

Cruz alleges that NCP violated this regulation by accepting payment from Matchroom under the contract, rather than, apparently, declining payment. *See* FAC ¶¶ 181–86. There are three problems with this argument. First, Cruz agrees that NCP was a promoter, and so its payment to Cruz seems to abide by the requirement that boxers "shall by paid by the promoter . . ." Second, the purpose of this regulation seems to be assurance that the promoter pays the boxer via a check. Cruz does not allege that he was not paid by check, so it is not clear that he can state a claim for violation of this regulation. Third, it is not clear why New York law regulations govern this context, where Cruz does not allege that he had any boxing matches or any interactions with the defendants in New York, despite Matchroom's headquarters in the state. *See* SAC ¶¶ 34, 49, 56, 61 (stating his matches were in San Francisco, Detroit, and Orlando). Cruz seems to assert that New York law applies because it governs the contract—as discussed below, *infra* Part I.D—but this cause of action does not arise from the contract. He does not cite law supporting his argument that New York law governs any claim arising from his relationship with the defendants just because he has an agreement with them that is governed by New York law. In opposition, he says I do not have to decide this question at the motion to dismiss stage, Oppo. 14:1–17, but he also cites no law to support that proposition.

Accordingly, this claim is dismissed. It seems unlikely that Cruz can amend his complaint to properly assert this New York state law claim, but if he can, he has leave to do.

### D.     Other State Law Claims

Cruz brings six state law claims arising from the contract itself: breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, conversion, accounting, and declaratory relief. SAC ¶¶ 105–80. In the prior round of motions to dismiss, the parties assumed without discussing that California law governed these claims, despite the unequivocal language in the contract that "[the] Agreement is governed by the laws of the State of New York." Contract § 26. I instructed the parties to explain why California law applies instead of New York law. *See* Prior Order. They did not do so. Instead, they again assume California law governs

these claims.  This assumption without explanation or legal support is unhelpful.

The Second Restatement of the Law – Conflict of Laws provides:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied . . . unless . . . (a) the chosen state has no substantial relationship to the parties or the transaction and there is no reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties.

Rest. 2d Conflict of Laws § 187(2)[4]; *see also Foreman v. George Foreman Assocs., Ltd.*, 517 F.2d 354, 356 (9th Cir. 1975) (applying this rule in assessing the choice of law provision in a professional boxing contract).[5]

Here, the SAC asserts that each party is a citizen of a different state, SAC ¶¶ 26–29, and the contract itself says that Matchroom's "registered office" is in New York City, which seems to mean its headquarters, Contract p.1.  The contract does not specify where the bouts will take place and Cruz asserts that they have happened all over the country thus far.  *See* SAC ¶¶ 34, 49, 56, 61. It makes sense that the parties wanted the law of a single state to govern their contract given the different citizenships and the various potential locations for performing the contract.  And, it is reasonable that they chose the laws of New York because of Matchroom's headquarters.  Finally, the parties do not argue that applying New York law is contrary to the fundamental policy of California, and indeed the contract laws for each state are similar.  Accordingly, New York law applies.  The parties are instructed to use New York law for their breach of contract and related state law claims going forward.

### 1.   Breach of Contract

To state a claim for breach of contract under New York law, the plaintiff must plausibly

---

[4] The American Law Institute has published drafts of new and updated rules for the Third Restatement, but it appears there are no updates yet to § 187.

[5] Though my jurisdiction in this case is not based in diversity, I note that a court in this circuit, in a similar case, reasoned that federal courts sitting in diversity apply the substantive choice of law of the state in which it sits, and the California choice of law test that it cited is essentially identical to the one discussed above.  *See de la Hoya*, 2001 WL 34624886, at *3.

United States District Court
Northern District of California

1    allege "the existence of a contract, the plaintiff's performance pursuant to the contract, the

2    defendant's breach of its contractual obligations, and damages resulting from the breach."

3    *Marinaccio v. Town of Clarence*, 215 A.D.3d 1289, 1290, 189 N.Y.S.3d 329, 331 (2023) (citation

4    omitted).  Here, the parties do not contest that Cruz plausibly alleged that a contract existed, that

5    he performed pursuant to its terms, and that he was damaged.  The only issue is whether Cruz

6    plausibly alleged that NCP and Rodriguez breached their contractual obligations.

7         Cruz's pleadings include allegations that contextualize the contract as well as the contract

8    language itself.  Cruz alleges that the NCP defendants assigned their promotional rights to

9    Matchroom in exchange for a fee and for the influence and prestige of being associated with

10   Matchroom.  SAC ¶¶ 7–8.  Cruz also asserts that Matchroom is "one of the largest boxing

11   promotional companies in the world."  *Id.* ¶ 5.  The contract itself provides, "Matchroom shall pay

12   a signing-on bonus in the sum of US$250,000 [sic]. . . [which] shall be released to the

13   Promoter/Fighter as follows."  Contract § 5.1.  The contract also states, "The Purses for the Bouts

14   shall be as follows" and then lists various sums.  *Id.* § 6.1.  And, "All Purses referred to under this

15   Agreement shall be payable by Matchroom to the Promoter and as directed by the Promoter, to

16   Fighter within five (5) days of the conclusion of each Bout."  *Id.* § 8.2.  The contract defines the

17   Promoter as NCP and the Fighter as Cruz.  *Id.* at p.1.

18        At this stage, Cruz has plausibly alleged breach of contract under New York law.  His

19   theory of the case is that the contract requires Matchroom to pay NCP the prize money and then

20   requires NCP to pay Cruz the full sum, but NCP improperly deducted various amounts before

21   paying Cruz and so breached its obligations under the contract.  *See* SAC ¶¶ 110–30.  The parties

22   agree, and it is clear from the contractual language, that the contract says Matchroom was to pay

23   NCP which in turn was to pay Cruz.  The parties also do not dispute that the contract does not

24   have language explaining whether NCP was entitled to keep any money before paying Cruz.  At

25   the prior motion to dismiss hearing, I explained that Cruz's theory of the case was murky because

26   it was unclear what NCP gained from being party to the contract, if it did not get to keep some of

27   the prize money paid to Cruz.  But Cruz has now resolved this ambiguity by asserting that NCP

28   was paid by Matchroom to sign the contract and that NCP gained additional perks—like the

United States District Court
Northern District of California

12

1    prestige and influence arising from association with a powerful player in the boxer promotional

2    world—in exchange for signing the contract.  That is plausible at this stage, regardless of whether

3    it is ultimately supported by the evidence.[6]

4         Cruz therefore plausibly alleged that the contract required NCP to pay him the full prize

5    money.  Because he also alleges that NCP failed to do so, he has alleged that NCP breached the

6    contract.  Accordingly, he stated a claim for breach of contract under New York law.  The motion

7    is DENIED on this basis.[7]

8                          **2.   Breach of Fiduciary Duty**

9         Under New York law, to assert a claim for breach of fiduciary duty, a plaintiff must

10   alleged, "(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and

11   (3) damages directly caused by the defendant's misconduct" and these "elements must be pleaded

12   with the particularity required by CPLR [New York Civil Practice Law and Rules] 3016(b)."

13   *Stinner v. Epstein*, 162 A.D.3d 819, 820, 79 N.Y.S.3d 212, 214 (2018) (citing *Palmetto Partners,*

14   *L.P. v. AJW Qualified Partners, LLC*, 83 A.D.3d 804, 807–808, 921 N.Y.S.2d 260)).  CPLR

15   3016(b) in turn provides, "Fraud or mistake.  Where a cause of action or defense is based upon

16   misrepresentation, fraud, mistake, wilful default, breach of trust or undue influence, the

17   circumstances constituting the wrong shall be stated in detail."

18        Additionally, under New York law "a simple breach of contract is not to be considered a

19   tort [for breach of fiduciary duty] unless a duty independent of the contract itself has been

20   violated.  This legal duty must spring from circumstances extraneous to, and not constituting

21   elements of, the contract, although it may be connected with and dependent upon the contract."

22

23   _____

24   [6] The NCP defendants do not argue that Cruz cannot look beyond the terms of the written contract
     to clarify the terms.  In this case, the contract does not contain language defining NCP's payment
25   or clarifying the consideration it received for entering the contract.  This may be a case where the
     parol evidence rule does not bar consideration of separate contracts beyond the written contract
26   here.  *Cf. CBI Cap. LLC v. Mullen*, No. 19 CIV. 5219 (AT), 2020 WL 4016018, at *6 (S.D.N.Y.
     July 16, 2020) (explaining the parol evidence rule under New York law).  The parties are
27   encouraged to address this and other relevant New York contract law at the dispositive motion
     stage.

28   [7] Cruz also filed a claim for breach of the covenant of good faith and fair dealing.  SAC ¶¶ 131–
     58.  The defendants did not move to dismiss this claim.

     United States District Court
     Northern District of California

                                                    13

*Physicians Mut. Ins. Co. v. Greystone Servicing Corp.*, No. 07 CIV. 10490 (NRB), 2009 WL 855648, at *9 (S.D.N.Y. Mar. 25, 2009) (quoting *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 656–57, 516 N.E.2d 190 (1987)). Where breach of fiduciary duty "is 'merely a restatement, albeit in slightly different language, of the "implied" contractual obligations asserted in the cause of action for breach of contract,' the claim is barred as redundant." *Id.* (quoting *Clark-Fitzpatrick*, 70 N.Y.2d at 389); *see also Ullmann-Schneider v. Lacher & Lovell-Taylor, P.C.*, 121 A.D.3d 415, 416, 994 N.Y.S.2d 72, 73 (2014) (dismissing claims for breach of fiduciary duty "as duplicative" where they were "based on the same allegations and seek the same damages as the breach of contract [claim]" (citing *Chowaiki & Co. Fine Art v. Lacher*, 115 A.D.3d 600, 600, 982 N.Y.S.2d 474, 475 (2014)); *Chowaiki*, 982 N.Y.S.2d at 475 (affirming dismissal of "breach of fiduciary duty as duplicative of the breach of contract claim, since the claims are premised upon the same facts and seek identical damages" and collecting cases); *Soames v. 2LS Consulting Eng'g, D.P.C.*, 187 A.D.3d 490, 133 N.Y.S.3d 559, 561 (2020) (affirming partial dismissal of breach of fiduciary cause of action, where lower court dismissed "only [the] aspects . . . that were duplicative of the breach of contract claims" (citation omitted)); *cf. Pergament v. Roach*, 41 A.D.3d 569, 571–72, 838 N.Y.S.2d 591, 594 (2007) (affirming dismissal of breach of contract claim where it was "essentially duplicative of the breach of fiduciary duty cause of action" and collecting cases).

Cruz fails to plead that the NCP defendants were fiduciaries under New York law. *See* SAC ¶¶ 159–65 (asserting that the NCP defendants are fiduciaries under California law). He also fails to explain whether he may bring a breach of fiduciary claim alongside a breach of contract claim under New York law, whether he is pleading them in the alternative, or anything else. *See Physicians Mut. Ins. Co.*, 2009 WL 855648, at *9; *Ullmann-Schneider*, 994 N.Y.S.2d at 73; *Chowaiki*, 982 N.Y.S.2d at 475; *Soames*, 133 N.Y.S.3d at 561. Accordingly, this cause of action is dismissed with leave to amend to clarify the allegations and legal basis under New York law.

### 3. Conversion

Under New York law, "[c]onversion is 'the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.'"

*Physicians Mut. Ins. Co.*, 2009 WL 855648, at *10 (quoting *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403–404 (2d Cir. 2006)).  To plead a claim for conversion, the plaintiff must allege: "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Id.* (citation omitted).

New York courts dismiss conversion claims where they are "duplicative of a breach of contract claim." *Id.* (first citing *AD Rendon Commc'ns, Inc. v. Lumina Americas, Inc.*, No. 04-CV-8832 (KMK), 2007 WL 2962591, at *4–8 (S.D.N.Y. Oct. 10, 2007); and then citing *Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 431 (S.D.N.Y.2004)).  To determine if a conversion claim is duplicative of the breach of contract claim, "courts look both to the material facts upon which each claim is based and to the alleged injuries for which damages are sought." *Id.* (quoting *AD Rendon*, 2007 WL 2962591, at *5).  Where the conversion claim is based on the same underlying facts, it will be dismissed.  *Id.*; *see also Regan v. Conway*, No. 07-CV-3207-ADS-ARL, 2009 WL 10708790, at *7 (E.D.N.Y. Sept. 30, 2009) (same).

Here, Cruz fails to allege that he had ownership, possession, or control over the property before its conversion.  *See Physicians Mut. Ins. Co.*, 2009 WL 855648, at *10.  He also fails to plausibly allege that he can bring his conversion claim alongside his breach of contract claim under New York law.  It is plausible that he can remedy both deficiencies upon amendment, including perhaps by bringing the conversion claim in the alternative to the breach of contract claim.  If he elects to do this, he should cite legal authority (from New York) that permits him to do so.  The claim is dismissed with leave to amend.

### 4. Accounting

Under New York law, "[a]n equitable accounting involves a remedy designed to require a person in possession of financial records to produce them, demonstrate how money was expended and return pilfered funds in his or her possession." *Metro. Bank & Tr. Co. v. Lopez*, 189 A.D.3d 443, 446, 137 N.Y.S.3d 319, 322 (2020) (citation omitted).  "The elements include a fiduciary or confidential relationship, money entrusted to the defendant imposing the burden of an accounting,

15

1   the absence of a legal remedy, and in some cases a demand and refusal." *Id.* (citing *Matsumura v.*

2   *Benihana Nat'l Corp.*, No. 06-CV-7609-NRB, 2007 WL 1489758, at *4 (S.D.N.Y. May 21,

3   2007)). "[A]n equitable accounting claim cannot coexist with a breach of contract claim covering

4   the same subject matter." *CBI Cap. LLC v. Mullen*, No. 19-CV-5219-AT, 2020 WL 4016018, at

5   *7 (S.D.N.Y. July 16, 2020) (citation omitted).

6       As with the breach of fiduciary claim, Cruz fails to allege that NCP was a fiduciary under

7   New York law. He also fails to plead that his accounting claim can coexist alongside his breach of

8   contract claim. It is plausible that he can remedy both of these deficiencies upon amendment,

9   including perhaps by bringing the accounting claim in the alternative to the breach of contract

10  claim. If he elects to do this, he should cite legal authority (from New York) that permits him to

11  do so. The claim is dismissed with leave to amend.

12                      **5.   Declaratory Relief**

13      Finally, Cruz has sufficiently stated a cause of action for declaratory relief at this stage

14  because he has sufficiently alleged that there is a real and justiciable controversy. *See Ford v.*

15  *Cardiovascular Specialists, P.C.*, 71 A.D.3d 1429, 1429–30, 896 N.Y.S.2d 776, 777 (2010); *WMC*

16  *Realty Corp. v. City of Yonkers*, 193 A.D.3d 1018, 148 N.Y.S.3d 161, 169 (2021). Though under

17  New York law, courts have the equitable power to decline to grant declaratory judgment in certain

18  circumstances, *see, e.g.*, *Morgenthau v. Erlbaum*, 59 N.Y.2d 143, 146–55, 451 N.E.2d 150, 152–

19  57 (1983), I will not make that determination at such an early stage of litigation. The motion is

20  DENIED as to this claim.

21                  **E.      Motion to Strike**

22      The NCP defendants move to strike various allegations in Cruz's pleadings, mostly related

23  to his requests for declaratory relief. *See* MTD 6:18–7:2, 8:18–24. The defendants do not even

24  attempt to engage with the standard for granting a motion to strike under Federal Rule 12(f). Their

25  motion is DENIED.

26  **II.    MOTION TO COMPEL ARBITRATION AND/OR DISMISS FOR IMPROPER**

27          **VENUE OR FORUM NON CONVENIENS**

28      Matchroom filed a motion to compel arbitration and dismiss the case under FRCP 12(b)(3)

United States District Court
Northern District of California

or dismiss the case under the doctrine of forum non conveniens.  It argues that the arbitration clause in the contract is valid and enforceable, that it applies to all of Cruz's claims against Matchroom and the NCP defendants including the federal law claims, and that the proper enforcement mechanism for the arbitration clause is dismissal of the case under forum non conveniens.  *See* Mot. Compel.  In turn, Cruz asserts that Matchroom waived its rights to compel arbitration by litigating this case and waiting too long, that Matchroom cannot compel arbitration of claims asserted against only the NCP defendants, that the arbitration clause does not cover Cruz's statutory claims, and compelling arbitration violates California public policy, and that the case should not be dismissed even if arbitration is compelled.  *See* Oppo. Compel.

     **A.**       **Waiver**

           **1.**       **Whether Matchroom Waived Its Rights**

       Cruz argues that Matchroom waived its rights to enforce the arbitration agreement.  Oppo. Compel 11:23–13:6.  As relevant, this case was filed in December 2023, [Dkt. No. 1], and Matchroom filed an answer to the initial and the amended complaints demanding a jury, without asserting arbitration.  [Dkt. Nos. 16, 28].  Counsel for Matchroom was present at the first motion to dismiss hearing but not involved in the motion itself, and counsel did not indicate any intention to file a motion to compel.  [Dkt. No. 42].  After that hearing, on June 6 the parties filed a case management conference statement and Matchroom indicated its intention to file a motion to compel.  [Dkt. No. 44].  Two weeks after Cruz filed its SAC, Matchroom moved to compel.  [Dkt. No. 50].

       In a motion to compel arbitration, a district court's role is limited to determining "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *SteppeChange LLC v. VEON Ltd.*, 354 F. Supp. 3d 1033, 1040 (N.D. Cal. 2018) (citing *Lifescan*, 363 F.3d at 1012).  "[W]hether the parties have submitted a particular dispute to arbitration" is a "gateway issue[]" to decide.  *Martin v. Yasuda*, 829 F.3d 1118, 1123 (9th Cir. 2016) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).  "[W]aiver by litigation conduct" goes to arbitrability and so is part of this gateway issue. *See id.* (citing *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1121 (9th Cir. 2008)).

United States District Court
Northern District of California

1      A party asserting waiver of an arbitration agreement "must demonstrate: (1) knowledge of

2   an existing right to compel arbitration and (2) intentional acts inconsistent with that existing

3   right." *Armstrong v. Michaels Stores, Inc.*, 59 F.4th 1011, 1015 (9th Cir. 2023) (citing *Hill v.*

4   *Xerox Bus. Servs.*, 59 F.4th 457, 468–69 (9th Cir. Feb. 3, 2023)).  "[T]he burden for establishing

5   waiver of an arbitration agreement is the same as the burden for establishing waiver in any other

6   contractual context." *Id.*  The parties do not contest that all parties knew of the right to compel

7   arbitration, so the first prong is met here.

8      As to the second prong, "there is no 'concrete test' for assessing whether [the party moving

9   to compel arbitration] took acts inconsistent with its right to arbitration," so courts "consider the

10   totality of the parties' action," asking "whether those actions holistically 'indicate a conscious

11   decision . . . to seek judicial judgment on the merits of the arbitrable claims, which would be

12   inconsistent with a right to arbitrate.'" *Id.* (quoting *Hill*, 59 F.4th at 471, 473 n.19).  "[A] party

13   generally 'acts inconsistently with exercising the right to arbitrate when it (1) makes an intentional

14   decision not to move to compel arbitration and (2) actively litigates the merits of a case for a

15   prolonged period of time in order to take advantage of being in court.'" *Id.* (citation omitted).

16      In *Armstrong*, the Ninth Circuit held that the defendant did not make an intentional

17   decision not to move to compel arbitration where the defendant pleaded arbitration as an

18   affirmative defense in its answers "and explicitly and repeatedly stated its intent to move to

19   compel arbitration" in case management statements and the first case management conference.  *Id.*

20   The Ninth Circuit contrasted those facts from those in *Martin*, 829 F.3d at 1121–22, 1126, where

21   the defendants failed to move to compel arbitration for seventeen months after the case was filed,

22   participated in discovery, received an adverse ruling on a motion to dismiss, and explicitly "told

23   the district judge and opposing counsel that they were likely 'better off' in federal court" than in

24   arbitration.

25      In *Armstrong* the Ninth Circuit also held that the defendant did not actively litigate the

26   merits of the case for a prolonged period despite some limited discovery requests, where the

27   defendant "never wavered from the view that it had a right to arbitration," it moved to compel

28   within a year of the case being filed, it never sought or obtained a ruling on the merits, and it

"never waffl[ed] about whether to arbitrate or stay in district court."  59 F.4th at 1015–16.  Again the court contrasted these facts from those in *Martin*, 829 F.3d at 1126, where the defendant waived its right to arbitrate when it waited for over a year and then filed a motion and received a ruling "on a key merits issue" before moving to compel.  The Ninth Circuit also contrasted the facts in *Van Ness Townhouses v. Mar Industries Corp.*, 862 F.2d 754, 759 (9th Cir. 1988), where the defendant waived its right to arbitrate by litigating the case for two years and filing a motion to dismiss on the merits before moving to compel.

Recently, the Hon. Charles R. Breyer found the defendants waived their right to compel arbitration where they first filed and received an adverse ruling on a motion to dismiss "central claims," objected to the plaintiff's evidence, and filed an answer that did not mention arbitration, even though they eventually mentioned their intention to file a motion to compel in a case management statement and filed an amended answer asserting arbitrability five days later.  *FBC Mortg., LLC v. Skarg*, 699 F. Supp. 3d 837, 842 (N.D. Cal. 2023).  The defendants ultimately filed a motion to compel, eight months after the complaint was filed, and six weeks after receiving the adverse ruling.  *Id.*; *see also McBurnie v. Acceptance Now, LLC*, 643 F. Supp. 3d 1041, 1045–46 (N.D. Cal. 2022), *aff'd in part, remanded in part on other grounds sub nom. McBurnie v. RAC Acceptance E., LLC*, 95 F.4th 1188 (9th Cir. 2024) (finding the defendant waived rights to compel arbitration where it "actively litigat[ed]" the case for over eighteen months, including "substantive discovery" and "ma[king] considerable use of federal judicial resources in pre-settlement conferences before a magistrate judge").

These facts are similar to those in *Armstrong* and different from those in *Martin*, *Van Ness*, and *FBC Mortgage* because, while Matchroom could have and should have asserted arbitration as an affirmative defense in its first two answers, it did not wait long to file the motion to compel, and it has never filed a motion on the merits of the case, nor did it receive an adverse ruling.  That was the "significant" issue that caused Judge Breyer to find the defendants in *FBC Mortgage* waived their rights to move to compel.  699 F. Supp. 3d at 842–43.  Here, there are no similar acts that are inconsistent with the right to arbitrate.  *See Armstrong*, 59 F.4th at 1015.

Accordingly, Matchroom did not waive its rights to move to compel arbitration.

1

2

3

4

5

6

7

8

9

### B.      Compelling Arbitration of Claims Against NCP

Next, I address Matchroom's request to compel arbitration of claims asserted against the NCP defendants but not asserted against Matchroom.  *See* Repl. Compel 2:19–4:8.  Cruz brings ten causes of action in this case, but only sues Matchroom for accounting and declaratory relief.  *See* SAC.  Matchroom asserts that it can compel arbitration of the other eight claims because it was a signatory to a valid arbitration agreement and because courts allow even non-signatories to enforce arbitration agreements.  Repl. Compel 2–3.  It also argues that courts enforce arbitration agreements for any claims arising from those agreements, not just the specific claims called out in the agreement.  *Id.* 3–4.

While the Supreme Court and other courts have held that non-signatories may be able to enforce arbitration agreements in certain situations, in each of these cases the non-signatories sought to enforce claims filed against them.  *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 626–27, 631 (2009); *Knapke v. PeopleConnect, Inc*, 38 F.4th 824, 831 (9th Cir. 2022); *Ngo v. BMW of N. Am., LLC*, 23 F.4th 942, 946 (9th Cir. 2022).  That is not the issue here: Matchroom is a signatory to the agreement and seeks to compel arbitration of claims filed against a different party.  It is also true that courts enforce arbitration agreements broadly, particularly when they have language like that at issue here, which says that "[a]ny dispute, controversy, or claim arising out of or in connection with this Agreement" is subject to arbitration.  Contract § 21; *see Ambler v. BT Americas Inc.*, 964 F. Supp. 2d 1169, 1177 (N.D. Cal. 2013) (finding similar language "renders the arbitration provision quite inclusive").  But that goes to the scope of the agreement, not to whether one party may enforce another party's contractual rights, which is what Matchroom seeks here.

Even if the scope of the arbitration provision would have encompassed all of the claims now filed against NCP—which is plausible—that determination only matters if the arbitration agreement survives the gateway inquiry of "whether the parties have submitted a particular dispute to arbitration."  *Martin*, 829 F.3d at 1123 (quoting *Howsam*, 537 U.S. at 83).  If a party waives its rights to compel arbitration, the dispute does not meet the standard and that is the end of the inquiry.  *See id.*  Here, there is no doubt that NCP has waived arbitration at this point, though none

of the parties make (or contest) this argument.  *Cf. FBC Mortg.*, 699 F. Supp. 3d at 842 (finding

defendant waived arbitration rights by, among other things, filing motion to dismiss on the merits

before moving to compel); *see also Martin*, 829 F.3d at 1125 (explaining that the filing of a

motion to dismiss for lack of personal jurisdiction or for res judicata may not be enough to show

waiver, but filing a motion to dismiss on the merits may alone be enough to do so).  NCP would

therefore be unable to compel arbitration of the claims filed against it; it is unclear how

Matchroom could circumvent waiver law and do so in NCP's stead.

Matchroom fails to cite a single case that is on point with its proposition; it points me to no

caselaw (nor could I find any) that says one signatory to an arbitration agreement can move to

compel arbitration of claims filed against another signatory, let alone in a situation akin to this

one, where the other signatory has waived its rights to compel arbitration.  Without support in the

law, I decline to allow Matchroom to move to compel claims brought against NCP.

### C.       Scope of the Agreement

Next I turn to the question of whether the arbitration clause encompasses the two claims

against Matchroom.  I conclude easily that it does.  The language of the clause is broad—it

provides that "[a]ny dispute, controversy, or claim arising out of or in connection with this

Agreement" is subject to arbitration.  Contract § 21.  Cruz's claims for accounting and declaratory

relief arise directly from its contractual relationship with Matchroom (and NCP) and so those

claims are arbitrable.  *See Ambler*, 964 F. Supp. 2d at 1177–78.  The arguments that these claims

somehow are unrelated to the parties' performance under the agreement, Oppo. Compel 5:6–6:10,

are unconvincing.  To the extent that Cruz asserts that the arbitration clause does not apply to

"statutory" claims, *see id.* 10:17–11:22, the two claims against Matchroom are not based in a

statute.  Finally, Cruz says that California public policy precludes arbitration of boxing-related

claims, *id.* 13:7–14:14, but the cases he cites do not stand for that proposition.  His

counterarguments fail.

### D.       Forum Selection Clause

Finally, Matchroom argues that the arbitration clause is equivalent to a forum selection

United States District Court
Northern District of California

21

1    clause and so the complaint should be dismissed pursuant to forum non conveniens.[8]  Mot.

2    Compel 11:15–14:2.  For support Cruz cites the recent Supreme Court case *Smith v. Spizziri*, 601

3    U.S. 472, 475–76 (2024), which held that FAA § 3 does not permit a district court to dismiss a

4    case pending arbitration.

5         Matchroom notes that the Supreme Court has said, "[T]he appropriate way to enforce a

6    forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non*

7    *conveniens*" under 28 U.S.C. § 1404(a).  *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of*

8    *Tex.*, 571 U.S. 49, 60 (2013).  But *Atlantic Marine* did not involve arbitration agreements.  To

9    support Matchroom's proposition that an arbitration clause constitutes a forum selection clause, it

10   cites a footnote in a Ninth Circuit case from 1988.  *See* Mot. Compel 8:10–18 (citing *Manetti-*

11   *Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n.4 (9th Cir. 1988)).  That case said that

12   determining whether a forum selection clause applied to a tort claim depended on whether the

13   resolution of the claim related to the interpretation of the contract, and then cited *Mediterranean*

14   *Enterprises, Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1463 (9th Cir. 1983), for the proposition that

15   the court had to determine whether the claims at issue required interpretation of the contract.

16   *Manetti-Farrow*, 858 F.2d at 514.  In a footnote, the Ninth Circuit added, "Although

17   *Mediterranean* involved interpretation of the scope of an arbitration clause, we apply its analysis

18   here because an agreement to arbitrate is actually a specialized forum selection clause." *Id.* at 514

19   n.4 (citing *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974)).  And in the case cited in that

20   footnote, the Supreme Court in *Scherk*, 417 U.S. at 519, wrote (in 1974) that "[a]n agreement to

21   arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that

22   posits not only the situs of suit but also the procedure to be used in resolving the dispute."

23         *Manetti-Farrow*, *Scherk*, and *Mediterranean*—all cases that are over thirty years old—

24   involved contracts with clauses calling for proceedings to occur in a foreign country.  None of

25   these cases purport to apply to all forum selection clauses, let alone to stand for the proposition

26

27   _____

28   [8] In this section of its brief, Matchroom argues that I am "unfamiliar with the laws of New York"
     and that "the Central District of California's" laws are relevant.  Mot. Compel 13:22–23, 14:1–2.
     Both suppositions are incorrect.

United States District Court
Northern District of California

that a location in an arbitration clause is equivalent to and has the same legal effect as a forum

selection clause.  Importantly, the FAA has different provisions when arbitration involves

international tribunals.  *See* 9 U.S.C. §§ 201–208; *Day v. Orrick, Herrington & Sutcliffe, LLP*, 42

F.4th 1131, 1133 (9th Cir. 2022) (explaining differences between Chapter One of the FAA,

"which governs domestic arbitral disputes" and Chapter Two of the FAA, which "provide[s] for

the effective and efficient resolution of international arbitral disputes"); *Scherk*, 417 U.S. at 515–

19 (explaining unique importance of forum selection clauses in international agreements); *see also*

*GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S.

432, 439–40 (2020) (analyzing interplay between international treaty and FAA); *Setty v. Shrinivas*

*Sugandhalaya LLP*, 3 F.4th 1166, 1168 (9th Cir. 2021) (analyzing an international arbitration

agreement).  I am not convinced that Matchroom's cited cases—published over three decades ago

and concerning a somewhat different area of law—support the proposition that Matchroom

suggests, that arbitration agreements in domestic disputes are forum selection clauses and that

litigation involving such an agreement must necessarily be transferred to the venue provided for

arbitration.  It is telling that Matchroom has not found a case to support this proposition published

in the last 35 years.

Indeed, Matchroom's conclusion seems to contrast the Ninth Circuit's holding in *Textile*

*Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781, 785 (9th Cir. 2001), in which the court explained

that the FAA "does not require" that a petition to compel arbitration be filed in the district where

the arbitration agreement specified that arbitration should occur.  In other words, the FAA does

not prohibit motions to compel arbitration from being filed in venues not mentioned in the

arbitration agreement, which suggests that the FAA—and by extension, an arbitration clause—is

not a basis for a motion to transfer venue under forum non conveniens.

Again, without any case law on point, I decline to grant Matchroom's request to dismiss

this case pursuant to forum non conveniens.  Indeed, this venue makes sense—one of the bouts

under the contract occurred in the same city as this courthouse, another bout occurred in southern

California, and one defendant is a resident of California.  Notably, Matchroom did not file a

motion to dismiss for lack of personal jurisdiction—that it could have filed without waiving its

rights to compel arbitration, *see Martin*, 829 F.3d at 1125—which supports the conclusion that this court is the proper venue for this dispute.

Matchroom's motion is DENIED as to this request.

### E.      Stay of Proceedings

In the alternative, Matchroom seeks a stay of this case while arbitration takes place.  Mot. Compel 15:2–3.  At argument, the parties agreed that that they would consider stipulating to stay the arbitration of Matchroom's two claims rather than staying the litigation to arbitrate.  I will address this question as well as the case schedule at a case management conference set for September 24, 2024 at 2:00 p.m.  The parties shall file a case management statement one week in advance, discussing how they wish to proceed, including on any counterclaims, and proposing a case schedule.

### CONCLUSION

For those reasons, the motion to dismiss is GRANTED in part and DENIED in part with leave to amend.  Any amended complaint should be filed within 20 days of this Order.  The motion to compel arbitration is GRANTED in part and DENIED in part.  The claims against Matchroom are stayed pending the outcome of arbitration.  The motion to dismiss and transfer venue is DENIED.

**IT IS SO ORDERED.**

Dated: August 27, 2024

William H. Orrick
United States District Judge