UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDY CRUZ GOMEZ,<br><br>  Plaintiffs,<br><br> v.<br><br>NEW CHAMPION PROMOTIONS, LLC; JESSE RODRIGUEZ; MATCHROOM BOXING USA, LLC; AND DOES 1-25,<br><br>  Defendants,<br><br>And related Cross-Actions | Case No.: 3 :23-cv-06608-WHO<br><br>**[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

## I.  **INTRODUCTION**

This matter came for bench trial from September 2-5, 2025, on Plaintiff/Cross-Defendant ANDY CRUZ GOMEZ ("Cruz") and Defendant/Cross-Complainant NEW CHAMPION PROMOTIONS LLC's ("NCP") claims for Declaratory Relief requiring me to interpret the rights and obligations of Cruz, NCP, and non-participating party MATCHROOM BOXING USA,

///

///

LLC ("Matchroom") under two boxing promotional agreements. (See, Documents 110, 118, 119, 120, 121, 124, 125 and 71.)[1]

Cruz and NCP submitted competing Proposed Findings of Fact and Conclusions of Law on September 29, 2025. (See, Document 130.)

## II.    FINDINGS OF FACT

### A. Credibility of the Parties and Witnesses

The witnesses at trial were Cruz, his boxing managers Yolfri Sanchez ("Sanchez") and Alexy Ferrer ("Ferrer"), NCP President Jesse Rodriguez ("Rodriguez'), Matchroom President Frank Smith ("Smith"), and NPC expert Stephen Bash.

Cruz testified credibly about his background, his career, and his understanding of the agreements at issue, and why he signed them.

Ferrer testified credibly as to his dealings in the boxing business and the relevant agreements.

Sanchez testified credibly about the agreements at issue and the dealings between the parties. He also testified, at times against his own interests, about a series of side agreements between himself and Rodriguez involving sharing their respective promotional and management commissions and outside business ventures, such as helping to fund a baseball player to defect from Cuba.

Smith's testimony was credible as to his limited knowledge of the terms of agreements between Cruz and NCP.

Rodriguez' testimony often times contradicted itself and the case exhibits entered into evidence. For example, Rodriguez testified on direct that there was a text message from Sanchez in which Sanchez confirmed NCP was due 25% of Cruz' signing bonus ("And he specifically says the 25 percent.") (409:11-410:6.) On cross-examination, Rodriguez repudiated this testimony ("You can read it back. I have never said that he agreed in writing to pay me 25 percent.") (428:4-429:18.)

---

[1] Although the operative Complaint and Cross-Complaint mentioned both the NCP Promotional Agreement and the Matchroom Promotional Agreement, neither pleading brought an action under the NPC PA nor specifically asked the Court to interpret it.

1  Further, Rodriguez testified that had "absolutely not" been told by Matchroom that it couldn't pay Cruz' Cuban bank account. (484:11-485:14.) He was then impeached with the introduction of Exhibit 10, an email to him from Matchroom's counsel informing him "As I am sure you are aware, we will need to pay into a US account due to imposed sanctions in Cuba." (485:15-487:16.)

NCP's expert, Mr. Bash, answered questions directly when posed by Mr. Gallegos or by the Court, but would not provide direct answers to questions posed by Mr. Smith. However, he ultimately conceded that it would not be appropriate for a promoter to take a provision of services fee from a sum characterized as a purse, but that it could do some from a "package fee." (570:7-571:19.)

### B. Background

Cruz is a professional boxer. Prior to "turning pro" Cruz was a highly decorated amateur boxer. He joined the Cuban boxing academy when he was eleven years old and then went on to win many national and international tournaments, including an Olympic gold medal in Tokyo 2020 games. (223:7-9; 224:13-15; 225:2-16.)

Despite Cruz' talents, the laws of Cuba prevented him from fighting professionally; to earn a living he had to escape Cuba and government chaperones who traveled with him. (225:19-25-226:1-16.)

Cruz' initial attempts to escape Cuba failed; he was caught and jailed by the communist regime. (227:14-18.)

In mid-2022, Cruz became connected with Dominican baseball manager Sanchez; thereafter the men has a series of calls about Sanchez helping Cruz get out of Cuba. (23:1-11; 63:18-25.)

Sanchez had a history of successfully extracting athletes from Cuba. (21:1-3; 21:25-22:13.)

With Sanchez' help, Cruz obtained a Visa enabling him to travel from Cuba to the Dominican Republic; Cruz arrived on November 5, 2022. (23:2-7.)

Prior to Cruz' arrival in the Dominican Republic, Sanchez began to contemplate managing Cruz' professional career; because he did not have boxing knowledge, Sanchez reconnected with Ferrer. (23:8-15; 23:23-25; 24:8-11.)

1   Ferrer, himself a former boxer, had previously left Cuba and was living in the United States
2   while managing professional boxer David Morrell. (76:3-11; 169:3-23.)

3   In or about October 2022, Ferrer introduced Sanchez to Rodriguez. (24:22-25:8.)

4   Ferrer had met Rodriguez in early 2022 through a boxing reporter. (173:1-174:2.)

5   Thereafter, Ferrer began to manage a couple of other Cuban fighters who were signed to
6   promotional agreements with NCP, Rodriguez' promotions company. (174:25-175:9.)

7   At the time, Rodriguez was paying those fighters – Mr. Leon, Mr. Castro, and Alex – and
8   was not taking any more from their purses as a promotional fee. (430:1-433:21.)

9   Even before being connected to Rodriguez, it was Sanchez and Cruz' plan to sign Cruz to a
10  large promoting company that had a world class platform and budget worthy of Cruz' talents.
11  (25:9-22.)

12  Rodriguez represented himself as someone with connections to the major promoters in
13  United States boxing who was capable of helping Sanchez and Ferrer obtain a lucrative promotional
14  agreement for Cruz. (26:11-23.)

### C. The NCP/Cruz Promotional Agreement (Dated November 8, 2022)

16  In November 2022, a few days after Cruz arrived in the Dominican Republic, Cruz, Ferrer,
17  Sanchez, and Rodriguez had dinner so that the group could meet in person. (26:24 -27:14.)

18  Following the dinner – either later that night or the next morning – Rodriguez presented a
19  Boxing Promotional Agreement with New Champion promotion to Cruz ("NCP PA"). Cruz
20  executed the NCP PA on November 8, 2022 over breakfast at a restaurant in the Dominican
21  Republic. (242:21:244:6.)

22  Cruz did not consult counsel before signing the agreement. (148:25-149:6.)

23  However, Cruz spoke with Rodriguez, who told him that the agreement was necessary to
24  allow him speak with the major promoters on Cruz' behalf. (243:6-244:2.)

25  Rodriguez told Cruz that NCP's earnings would come from the promoter and not come out
26  of Cruz' purses. (239:13-24.)

27  The NCP PA specified that NCP would put on a specified number of bout featuring Cruz
28  and would pay him purses to appear therein. (439:17-19.)

4
FINDINGS OF FACT AND CONCLUSIONS OF LAW

However, Cruz had zero expectation that NCP would actually promote one of his bouts, because he expected to sign a promotional agreement with a bigger company. (240:7:15; 244:23-245:8.)

The NCP PA specified minimum purses, with actual sums subject to negotiation, but no maximum. (439:23-440:18.)

Cruz' purses under the NCP PA could have run into the hundreds of thousands or millions of dollars. (449:3-15.)

At no point after the execution of the NCP PA did NCP put on a Cruz bout or did NCP pay Cruz for his appearance in a boxing match. (444:19-445:12.)

At the time the NCP PA was executed, NCP did not have a single sponsor and did not have a broadcast agreement. (437:10-14.) Rodriguez was NCP's only employee of New Champion Promotions. (437:7-9.)

In its history, NCP had only been lead promoter for a single boxing event, on which it lost money. (437:18-21.) However, Rodriguez never disclosed this failure to Cruz, Sanchez, or Ferrer. (26:8-10; 175:10-16.)

At the same time that Cruz executed the NCP PA, he signed a management agreement with Sanchez and Ferrer on a form provided by Rodriguez. That contract specified the duties of the managers, payment for the managers, and guaranteed monthly salary that Sanchez would pay to Cruz for the first year of the agreement. (233:12-235:11.)

### D. The Matchroom/NCP/Cruz Promotional Agreement (Dated May 4, 2023)

Cruz signed the Matchroom PA at some time in April when he was in the Dominican Republic. (247:9-247:21)

Prior to the time of execution, Cruz did not directly communicate with anybody from Matchroom or Rodriguez about the agreement. (246:4-247:3.)

The commercial terms of the Matchroom PA were negotiated between Jesse Rodriguez and Frank Smith of Matchroom. (449:23-25.)

NCP attorney Pat English negotiated terms of the Matchroom PA for NCP. (450:1-3.)

Cruz was unrepresented with respect to the Matchroom PA. (450:4-7.)

     The Matchroom PA does not contain any provision specifying that NCP would receive 25% of the money paid thereunder.  (449:16-22.)

     Rodriguez never told Frank Smith that the Matchroom PA needed to include a term specifying 25% payment of all funds therein to NCP.  (451:14-24.)

     Rodriguez never told his attorney that the Matchroom PA needed to include a term specifying 25% payment of all funds therein to NCP.  (452:1-11.)

     Rodriguez testified – inconsistently – that he and Cruz entered into a verbal agreement that NCP would receive 25% of Cruz' signing bonus and first year purses under the Matchroom PA, but that any percentage of purses thereafter was undecided and would be negotiated thereafter.  (480:18-482:1.)

     No document after the Matchroom PA signed by both NCP and Cruz.  (454:1-18.)

     NCP never signed any of Cruz' bout agreements (454:19-23.)

     Sanchez and Rodriguez each testified to a series of agreements and loans between them that led to their funds being exchanged, but at no time did Cruz ever authorize NCP to withhold money from him in order to satisfy any debt due from his managers.  (462:24-463:19.)

**CONCLUSIONS OF LAW**

     **Florida Law and the NCP PA**

     Interpretation of a contract is a question of law.  *Inter–Active Servs., Inc. v. Heathrow Master Ass'n, Inc.*, 721 So.2d 433, 434 (Fla. 5th DCA 1998). The parties' intention governs contract construction and interpretation; the best evidence of intent is the contract's plain language. *Royal Oak Landing Homeowner's Ass'n, Inc. v. Pelletier*, 620 So.2d 786, 788 (Fla. 4th DCA 1993). The court should reach a contract interpretation consistent with reason, probability, and the practical aspect of the transaction between the parties. *Thompson v. C.H.B., Inc.*, 454 So.2d 55, 57 (Fla. 4th DCA 1984). "All contracts must be given a reasonable interpretation according to the intention of the parties at the time of executing them." *Seritage SRC Fin., LLC v. Town Ctr. at Boca Raton Tr.*, 397 So. 3d 44, 46 (Fla. Dist. Ct. App. 2024), reh'g denied (Dec. 6, 2024), quoting *Holmes v. Kilgore*, 89 Fla. 194, 103 So. 825, 827 (1925).  When the terms of a contract are ambiguous, parol

1  evidence is admissible to "explain, clarify or elucidate" the ambiguous terms. *Strama v. Union Fid.*
2  *Life Ins. Co.*, 793 So.2d 1129, 1132 (Fla. 1st DCA 2001).

3  "Under Florida law, a contract implied-in-fact is an enforceable contract. It is based on an
4  implicit promise, one that is inferred in whole, or in part, from the parties' conduct. Typically, in
5  these contracts, the parties have in fact entered into an agreement, but without sufficient clarity, so a
6  fact finder must examine and interpret their conduct to define their unspoken agreement. An
7  implied contract requires the same elements as an express contract, and differs only in the parties'
8  method of expressing mutual consent." *Fertilizantes Tocantins S.A. v. TGO Agric. (USA), Inc.*, 599
9  F. Supp. 3d 1193, 1206 (M.D. Fla. 2022), quoting *Tracfone Wireless, Inc. v. Simply Wireless, Inc.*,
10 275 F. Supp. 3d 1332, 1342 (S.D. Fla. 2017).

11 In the State of Florida, "the well established rule of law is that a contract may be discharged
12 or extinguished by merger into a later contract entered into between the parties in respect to the
13 same subject which replaces the original contract." *Aly Handbags, Inc. v. Rosenfeld*, 334 So.2d 124,
14 126 (Fla. 3d DCA 1976), citing 7 Fla. Jur. Contracts § 166 (1956).

15 "[A] merger clause is a highly persuasive statement that the parties intended the agreement
16 to be totally integrated." *World-Class Talent Experience, Inc. v. Giordano*, 293 So. 3d 547, 549
17 (Fla. 4th DCA 2020), review denied, No. SC20-797, 2020 WL 6867221 (Fla. Nov. 23, 2020). "To
18 determine the intent of the parties, a court should consider the language in the contract, the subject
19 matter of the contract, and the object and purpose of the contract." *MDS (Canada) Inc. v. Rad*
20 *Source Techs., Inc.*, 143 So. 3d 881, 891 (Fla. 2014) (quoting *Am. Home Assurance Co. v. Larkin*
21 *Gen. Hosp., Ltd.*, 593 So.2d 195, 197 (Fla.1992)).

22 These principles were applied and confirmed by the Federal Court in *Katz v. Fifield Realty*
23 *Corp.*, 746 F.Supp.2d 1265 (USDC S.D. FL, 2010), which involved an initial and amended
24 agreement for Katz to purchase a condo built by FRC.  As the Court explained, "The undisputed
25 record evidence establishes that, in January 2008, the parties executed an Amendment to Purchase
26 Agreement which provided that, upon execution of the 2008 Contract and expiration of the
27 statutory rescission period 'the [2006 Contract] will automatically be deemed terminated.' [DE
28 151–5, p. 2]. It also is undisputed that Plaintiffs executed the 2008 Contract, and did not exercise

their statutory right to rescind that contract. [DE 174, ¶¶ 12–13]. Thus, pursuant the plain language of the Amendment to Purchase Agreement, the 2006 Contract was terminated when the statutory period to rescind the 2008 Contract expired." *Id.* at 1269.  The Court when quoted the merger clause from the 2008 (later in time) contract: "This Agreement contains the entire understanding between Buyer and Seller. **Any current or prior agreements, representations, understandings or oral statements of sales representatives or others, if not expressed in this Agreement, the Condominium Documents or in brochures for the Condominium, are void and have no effect. Buyer agrees that Buyer has not relied on them.**"  (emphasis original) *Id.*  Finally, the Court concluded that "Because the 2006 Contract was terminated by the parties' Amendment to Purchase Agreement, and replaced by their 2008 Contract, the 2006 Contract" could not be the basis for a cause of action.  *Id.* at 1269-1270.

**New York Law and the Matchroom PA**

New York law on the interpretation of contracts requires, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms" *W.W.W. Assoc. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990). Whether a contractual term is ambiguous must be determined by the court as a matter of law, looking solely to the plain language used by the parties within the four corners of the contract to discern its meaning and not to extrinsic sources. *See Kass v. Kass*, 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350, 696 N.E.2d 174 (1998). Unless a Court first finds ambiguity on the face of the agreement, extrinsic and parol evidence is inadmissible at trial or on a motion for summary judgment to create ambiguity.  *See W.W.W. Assoc. v. Giancontieri*, 77 N.Y.2d 157, 163, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990).

Importantly, "ambiguity never arises out of what was not written at all, but only out of what was written so blindly and imperfectly that its meaning is doubtful." *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 573, 780 N.E.2d 166, 173 (2002), quoting *Trustees of Freeholders & Commonalty of Town of Southampton v. Jessup,* 173 N.Y. 84, 90, 65 N.E. 949 (1903).

"Courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." *Vermont Teddy Bear Co. v. 538*

*Madison Realty Co.*, 1 N.Y.3d 470, 475, 775 N.Y.S.2d 765, 807 N.E.2d 876 (2004). Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Reiss v. Financial Performance Corp.*, 97 N.Y.2d 195, 199, 738 N.Y.S.2d 658, 764 N.E.2d 958 (2001).

Under New York law, a "substituted agreement immediately discharge[s]" previous obligations and replaces them with obligations under the new agreement. See *Denburg v. Park Chapin Flattau & Klimpl*, 604 N.Y.S. 2d 900, 906 (1993). Thereafter, a party may not sue for breach of the old agreement. See *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 287 n.1 (2d Cir. 1997) ("[A] substitute agreement extinguishes a claimant's prior claims upon execution of the agreement ...."); *Health-Chem Corp. v. Baker*, 915 F.2d 805, 811 (2d Cir. 1990) (stating that when a new agreement supersedes an older one, "the previous agreement is extinguished, thereby reducing the remedy for breach to a suit on the new agreement").

These principles are well illustrated in *Citigifts, Inc. v. Pechnik*, 112 A.D.2d 832 (1985). In that action, the Court considered two different agreements between the Pechnik and Goldfarb to sell a card and gift shop on Manhattan. *Id.* at 832-833.

In January 1981, Pechnik and Goldfarb signed a contract wherein Goldfarb would buy the business for "for payment of $33,750 at the signing of the contract, to be held in escrow; a check for $103,750 at the closing; and the balance plus interest to be paid under a schedule, $165,000 over a 36-month period, and $597,500 over a succeeding 144-month period. However, in a handwritten rider to the contract, Goldfarb agreed to an additional $200,000 cash payment on or before closing." *Id.* at 833. Closing under the agreement was delayed. In May 1981, Pechnik and Goldfarb executed another agreement, this time by and though Citigifts, Inc., an entity owned by Goldfarb. "The terms of this second contract were substantially the same as the first, except that the schedule of payments was changed and it included the sentence: 'This agreement supersedes any concurrent or previously signed documents.'" *Id.* Thereafter Citigifts, Inc. and Goldfarb brought an action for breach of the earlier January 1981 agreement. The Court found that the action could not stand on that agreement because, "Simply stated, the contract signed in May constituted a novation of the agreement reached four months earlier. By its terms, the May 4 contract superseded all prior or

currently existing agreements between the parties. Such a novation extinguished the old agreement (*Blair & Co. v. Otto V.*, 5 A.D.2d 276, 171 N.Y.S.2d 203), thereby reducing the remedy for breach to a suit on the new agreement (*Northville Industries Corp. v. Fort Neck Oil Terminals Corp.*, 100 A.D.2d 865, 867, 474 N.Y.S.2d 122)." *Id.* at 834.

These rules from *Citigifts, Inc.* were echoed by the United States District Court in *Witek v. City of New York*, No. 12-CV-981(CBA)(VVP), 2018 WL 11691108, at *4 (E.D.N.Y. Mar. 5, 2018), which informs, "Under New York law, a 'substituted agreement immediately discharge[s]' previous obligations and replaces them with obligations under the new agreement. See *Denburg v. Park Chapin Flattau & Klimpl*, 604 N.Y.S. 2d 900, 906 (1993). Thereafter, a party may not sue for breach of the old agreement. See *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 287 n.1 (2d Cir. 1997)."

In Defendants' Trial Brief, they argue that the Court should place substantial meaning in the fact that the Matchroom PA occasionally uses the phrase "Promoter/Fighter" where NCP is defined as Promoter and Cruz is defined as Fighter. Specifically, Defendants argue that Section 3.4 implies that "NCP/Cruz" are tied together beyond the expiration of the Matchroom PA. However Defendants interpretation of the virgule or "slash" is contrary to the definition thereof and New York law.[2]

In *L. B. Smith, Inc. v. Bankers Trust Co. of Western N. Y.*, 80 A.D.2d 496 (1981) the Court considered the meaning of a check made out to A/B and whether the virgule should be read to mean "and" or "or". "Simply put: does a check payable to "A/B" require the endorsement of both payees for negotiation or of only one?" *Id.* at 496. New York adopted the conclusion of the USDC DC and the Court of Appeals of Georgia and held "The virgule is normally used to separate alternatives. Thus, a bank exercising reasonable care and acting in good faith would necessarily interpret a check drawn to two payees whose names are separated by a virgule as being drawn payable to the payees in the alternative." *Id.* at 498. Accordingly the reasonable reading of the Matchroom PA is not that Matchroom was binding Cruz and NCP together after the agreement expired, but rather that

---

[2] Virgule is defined as follows: "[A] short diagonal line (/) placed between two words to indicate that either word can be used in interpreting the statement. Example: and/or; i. e., either "and" or "or" (Webster's New Twentieth Century Dictionary of the English Language, Unabridged, Second Edition [1964]).

10
FINDINGS OF FACT AND CONCLUSIONS OF LAW

Matchroom was casting a broad net to make sure that neither NCP nor Cruz, whichever might be applicable, would seek to circumvent its exclusive negotiation and matching rights.

**HOLDINGS**

In light of the findings of fact and conclusions of law, I find as follows:

1) Although the NCP PA facially required NCP to promote a certain number of Cruz fights, and required NCP to pay Cruz for those fights, neither Cruz nor NCP had a reasonable expectation that NCP would actually do so.

2) Instead, the agreed purpose of the NCP PA was for NCP to hold Cruz' promotional rights so that it would have documented permission to negotiate an agreement between Cruz and a "major" boxing promoter.

3) NPC was allowed to negotiate its own payment from that "major" promoter, but had no right or claim to money to be paid to Cruz from that promoter.

4) The purpose of NCP PA was completed when Cruz and NCP executed the Matchroom PA, which was negotiated by NCP and its counsel Pat English.

5) Accordingly, the Parties have no further rights or obligations to each other under the NCP PA.

6) The payment structure of the signing bonuses and purses specified in the Matchroom PA was required because Cruz did not have access to a United States bank account when the agreement was signed; Cruz now has a bank account and payment need not be directed through NCP.

7) The signing bonuses and purses set forth in the Matchroom PA, and paid by Matchroom, are the property of Cruz.

8) The various bout agreements, to the extent they deviated from the amount stated in the Matchroom PA or otherwise agreed to the by the Parties, do not modify the Matchroom PA; they are not an indication that Cruz was agreeing to take less money, or that NCP was entitled to any money.

9) The phrase "Promoter/Fighter" where it appears in the Matchroom PA, should be read "NPC or Cruz" or "neither NPC nor Cruz".

The performance of the parties, compliance with the stated obligations, and damages due (if any) are reserved for further proceedings herein.

**IT IS SO ORDERED.**

Date: _____

_____
William H. Orrick
United States District Judge