UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANDY CRUZ GOMEZ,

          Plaintiff,

     v.

NEW CHAMPION PROMOTIONS, LLC,

et al.,

          Defendants.

Case No. 23-cv-06608-WHO

**FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CLAIMS FOR DECLARATORY RELIEF**

### I.    INTRODUCTION

I conducted a bench trial from September 2–5, 2025, to untangle the rights and responsibilities of a world class boxer, plaintiff/counter-defendant ANDY CRUZ GOMEZ ("Cruz"), and defendant/cross-claimant NEW CHAMPION PROMOTIONS LLC ("NCP") and its President and sole employee, JESSE RODRIGUEZ ("Rodriguez"),[1] concerning two boxing promotional agreements: the Exclusive Promotional Agreement signed by Cruz and NCP on November 8, 2022 (the "NCP PA"), and the Boxing Promotional Agreement signed by them and defendant/cross-claimant MATCHROOM BOXING USA, LLC ("Matchroom"), effective May 4, 2023 (the "BPA"). With the parties' consent, I severed declaratory relief claims by Cruz and NCP

---

[1] Because of the nature of the relationship between Rodriguez and NCP, I refer to both interchangeably throughout this Order.

to do so. *See* Dkt. Nos. 110, 118–121. The witnesses at trial were Cruz, his boxing managers Yolfri Sanchez ("Sanchez") and Alexy Ferrer ("Ferrer"), Rodriguez, Matchroom President Frank Smith ("Smith"), and NCP expert Stephen Bash. *See* Dkt. Nos. 118–121.

The central problem presented is that neither agreement sets forth how NCP would be compensated for its service of getting Cruz signed by a major boxing promoter (Matchroom). Rodriguez claims that he made an oral agreement with Cruz and his managers that gives NCP a right to 25% of Cruz's payments from Matchroom. Cruz denies that such an oral agreement exists and contends that the written agreements, particularly the BPA, speak for themselves. There was clearly no meeting of the minds regarding how NCP would be compensated. Further, the text of the NCP PA does not reflect the purpose of the agreement between the parties and lacks essential terms of their agreement. As a result, the NCP PA is not a valid contract and is unenforceable. But there was mutual assent that NCP would work to find a major boxing promoter for Cruz, which it did. NCP is entitled to quantum meruit damages for its work, which will require a jury trial in the future.

The invalidity of the NCP PA also limits the applicability of the BPA as to NCP in particular. While the contents and existence of the BPA may be considered by a jury to determine the appropriate quantum meruit damages owed to NCP, without the promotional rights bestowed upon NCP in the NCP PA, NCP is no longer a valid party to the BPA. The BPA remains otherwise valid as to Cruz and Matchroom.

Additionally, as a result of the bench trial and this Order, it is obvious that I must reconsider some conclusions from my earlier Summary Judgment Order in this case. *See* Order on Cruz's Motion for Summary Judgment ("Prior Order") [Dkt. No. 94]. Parties are to address the implications of this Order on the case going forward at a Further Case Management Conference on December 2, 2025.

## II.    FINDINGS OF FACT

### A.  Background

1.  Cruz was a highly decorated amateur boxer before becoming a professional.  Trial Transcript 223:7-9; 224:13-16; 225:2-16.[2]

2.  He joined the Cuban boxing academy when he was eleven years old and went on to win many national and international tournaments, including an Olympic gold medal in the Tokyo 2020 games.  *Id.*

3.  He was educated in Cuba and went to college—finishing all but one semester at the University of Havana.  223:17–224:1.

4.  Before leaving Cuba at age 27, he did not have any experience in business or the business of professional boxing—he spent his time honing his boxing skills.  He was and is seen as "a spectacular talent" by Frank Smith and "the best…lightweight that there is in [the] world" by Alexy Ferrer.  310:3, 209:11-12.

5.  The laws of Cuba prevented him from fighting professionally; to earn a living as a boxer, Cruz had to leave Cuba.  226:17–227:8.

6.  After unsuccessful efforts to escape Cuba, including being jailed, he became connected with Dominican baseball agent Yolfri Sanchez, who had a history of successfully extracting athletes from Cuba, in mid-2022.  226:9-19; 228:2-19; 21:1-3; 21:25–22:13.

7.  The two men had a series of telephone calls concerning whether Sanchez could help Cruz get out of Cuba.  23:1-11; 63:18–64:2.

8.  Eventually, with Sanchez's help, Cruz obtained a Visa to travel from Cuba to the

---

[2] Volume 1 of the trial transcript includes pages 1–138, Volume 2 of the trial transcript includes pages 139–250, Volume 3 of the trial transcript includes pages 251–352, and Volume 4 of the trial transcript includes pages 353–574.  For ease of reference, I hereinafter refer to the trial transcript by page and line number only.

United States District Court
Northern District of California

Dominican Republic, which he did on November 5, 2022.  23:2-7; 228:14-25.

9.   While working on extracting Cruz from Cuba, Sanchez thought about whether he could manage Cruz's professional career.  21:13-24; 24:8-11; 69:10-16.  Before becoming an agent for baseball players, Sanchez had graduated from a university in the Dominican Republic with a degree in international business.  20:8-16.  He had no legal training.

10.  Given Cruz's illustrious amateur record, Sanchez expected that Cruz would be highly valued in the boxing world.  21:20-22.

11.  It was both Sanchez's and Cruz's goal that Cruz would sign with a large boxing promoting company that had a world class platform and budget worthy of Cruz's talents.  25:9-22; 229:25–230:3; 25:14-22; 231:17–232:5.

12.  Sanchez lacked specific boxing experience and had no significant contacts in the boxing world.  23:12-18; 64:14-16; 229:8-15.

13.  He reached out to Alexy Ferrer, whom he had known previously, who had both boxing experience and significant contacts.  23:23-25; 24:8-18; 170:16-24.

14.  Ferrer was a former boxer who started boxing when he was nine years old.  169:9-10.

15.  He emigrated from Cuba and was living in the United States while managing a successful professional boxer, David Morrell.  169:9-14; 76:3-11; 170:18-24.

16.  He also managed a couple of other Cuban fighters who were signed to promotional agreements with NCP, so Ferrer had an established relationship with Jesse Rodriguez, whom he first met in early 2022.  173:1–174:2; 174:25–175:9; 175:17-24; 177:7-11; 362:6-14.

17.  Rodriguez was paying Ferrer's boxers and was not taking any money from their purses as a promotional fee.[3]  430:1–433:22.

---

[3] As relevant to this case, a "purse" is defined in the BPA as, "The fee owed to the Fighter for

18. Rodriguez had been involved with boxing in various capacities since 2006.  357:2-5.

19. He had previously managed a law firm, been a financial adviser for Prudential Preferred Financial Services, and worked in construction and real estate development.  447:13-14; 502:24–504:6.

20. In addition to NCP, which is a Nevada LLC of which Rodriguez is the President and sole employee, he and his wife operated three other business entities: JR Construction, Home DreamWorks, and Export Connections LLC.  490:2-6; 491:14-22; 494:22–495:5; 503:16–504:14; 504:15–505:10.

21. As a result of his business enterprises, Rodriguez regularly employed the services of a lawyer.  504:15–505:3.

22. In or about October 2022, Ferrer introduced Sanchez to Rodriguez to discuss working with Cruz.  24:22–25:8;3 62:1-5; 203:18–204:15.

23. Given Cruz's profile in the boxing world, "the whole world wanted to" work with him and be in business with him, according to Ferrer.  184:4-7.  Frank Smith, CEO of Matchroom, testified, "undoubtedly everyone would be interested in signing Mr. Cruz."  263:6-14.

24. Rodriguez told Ferrer and Sanchez that he had connections to major boxing promoters in the United States and was capable of being an intermediary with them to help Sanchez and Ferrer obtain a lucrative promotional agreement for Cruz.  26:11-23; 76:17-21; 184:25–185:14; 362:15–363:13.

### B.  The NCP PA (dated November 8, 2022)

25. Cruz arrived in the Dominican Republic on November 5, 2022.  23:2-7; 229:23-252.

---

participating in a Bout . . . ."  Exh. 2 [Dkt. No. 125] at 2.

26. Prior to that time, he had not discussed Sanchez becoming his manager.[4] 23:8-11; 229:1-15.

27. Two days later, Cruz, his wife, Ferrer, Sanchez, and Rodriguez had dinner so that everyone could meet together for the first time. 26:24–27:14; 75:8-12; 185:22–186:1; 230:4-7. The conversation was primarily social; no business was discussed. 83:4-9; 212:13-25; 233:1-8.

28. At some point that evening or the next morning, Rodriguez presented Cruz with a draft of the NCP PA in both English and Spanish. Exh.101 [Dkt. No. 125]; 186:5-10; 369:23-25; 370:11-20; 375:18–376:22.

29. The next morning, Cruz executed the Exclusive Management Agreement with Sanchez and Ferrer on a form provided by Rodriguez. Exh.1 [Dkt. No. 125]; 27:24–29:16; 233:9-19; 234:24–235:1. Rodriguez and a notary public were also present.

30. The Management Agreement, among other things, specified the duties of the managers (Sanchez and Ferrer) and their payment (33% of all revenue generated by the boxing activities of Cruz—28% for Sanchez, 5% for Ferrer), and guaranteed Cruz a monthly salary of $11,000 that Sanchez would pay for the first year of the agreement. Exh. 1, ¶¶ 1, 3; 233:9–235:11.

31. Cruz also executed the NCP PA that morning. Exh. 101, Stipulated Facts Exh. 9 ¶ 6 [Dkt. No. 125]; 83:10-12, 83:16-20; 186:5-10; 242:21–244:6; 442:4-7.

32. Cruz, Sanchez, and Ferrer knew that they did not have the experience or the connections to initiate negotiations with a major promoter. Rodriguez said he had

---

[4] A federal law, the Muhammad Ali Boxing Reform Act ("Ali Act") was enacted in 2000 to better protect the rights and welfare of boxers. It defines a "manager" as "a person who receives service as an agent or representative of a boxer." 15 U.S.C. § 6301(5). A "promoter" is defined by the Ali Act as "the person primarily responsible for organizing, promoting, and producing a professional boxing match." 15 U.S.C. § 6301(9).

United States District Court
Northern District of California

those connections.  He further explained that in order to get the major promoters to talk

with him, he would need to show them that he had the promotional rights to Cruz and

that he would be able to assign those rights to a major promoter upon agreement.

33:15-15; 186:15-21.  Otherwise, the major promoters would not talk to him.  *Id.*

33. The reason to sign the NCP PA was so that Rodriguez could attempt to find and

negotiate a deal with a major boxing promoter to promote Cruz's career.  35:7-9; 39:4-

23; 71:4–72:25.

34. The form of the NCP PA, prepared by NCP's lawyer, appears to have been used before

for NCP's other boxers, but not for a boxer of Cruz's stature.  186:8-10.

35. The NCP PA says nothing about the actual purpose of the agreement (to have

promotional rights that could be assigned to a major promoter), nor anything

concerning NCP's rights to compensation for that work, including to any compensation

once the rights were assigned.  Exh. 101.

36. There is some dispute over when Cruz received the NCP PA and how much

explanation Rodriguez gave him, but given the limited time between presentation of

the agreement and its execution without amendment, and the relative lack of

sophistication of Cruz and Sanchez in the boxing business, it appears that little

attention was paid to its specifics.  33:2–34:12; 369:23-25; 370:11-20; 331:16-19;

335:17-25.

37. Cruz says that he received it at breakfast and the explanation was very cursory.

242:21–243:2.  He did not have a lawyer review it.  32:15-19; 78:16–81:13; 148:21–

149:6.

38. Sanchez said that he did not review the NCP PA before Cruz signed it because it was

just a document that would go to other promoters.  32:2–34:12.  He relied on

Rodriguez because of Rodriguez's 15-years of experience in the boxing world.  31:12-

7

13.

39. Rodriguez, in contrast, testified that he provided a Spanish language draft of the agreement to Cruz the night before, explained its provisions to Cruz, answered questions, went over it page by page, identified the commercial terms, and pointed out the five-year term of the contract and the minimum purses. 369:23-25; 370:11-20; 372:13–374:6; 376:23–377:11; 379:16–380:9.

40. Rodriguez also testified that he told Cruz that he would make Cruz a signatory to any subsequent co-promotion agreement if he assigned Cruz's promotional rights to a major promoter. 373:5-15. Cruz initialed the bottom right-hand corner of each page and signed the Spanish and English versions of the NCP PA. Exh. 101; Exh. 9 ¶ 6; 377:12–378:25.

41. The NCP PA is a one-sided document. It comprehensively details NCP's rights as a promoter. It provides, in essence, that Cruz assigns to NCP his exclusive boxing promotional rights for five (5) years, subject to extensions. Exh. 101 § II. It gives NCP the right to assign any of the promotional rights it obtained from Cruz. Exh. 101 § X. There are eleven pages worth of terms, almost all concerning NCP's promotional rights.

42. It does not list any obligations NCP has to Cruz, except that it promises to provide Cruz the opportunity to participate in three (3) fights per year with a minimum purse of $25,000 each with actual sums subject to negotiation. 439:23–440:18; Exh. 101 §§ I–IV.

43. At the time the NCP PA was executed, NCP did not have a single sponsor or a broadcast agreement. 437:10-14. In its history, it had only been a lead promoter for a single boxing event, on which it lost money. 358:4–359:8; 437:18-21. NCP's lack of experience actually promoting a boxing event was not disclosed to Cruz, Sanchez, or

8

Ferrer.  26:8-10; 175:10-16.

44. That said, no party expected that NCP would actually promote one of Cruz's bouts because all parties expected that Cruz would sign a promotional agreement with a major company once the NCP PA had been executed.  240:7:15; 244:23–245:8.

45. That was the sole reason that Cruz and his managers wished to work with Rodriguez. Once Cruz signed the NCP PA, Ferrer had "absolute certainty" that Cruz would be signed by a major promoter.  208:6-21.

46. Cruz also understood that the purpose of the agreement, as Rodriguez said, was that its existence would allow Rodriguez to "shop" him to major promoters.  231:17–232:5; 243:6-17.

47. The CEO of Matchroom, Frank Smith, confirmed that he would not have negotiated with Rodriguez unless Rodriguez had such an agreement in place with Cruz.  265:10-19; 266:1-18.

48. Glaringly, the NCP PA contains no provision specifying how NCP would be compensated in the event it succeeded in its central goal, landing a major boxing promoter to advance Cruz's career.

49. According to Cruz and Sanchez, Rodriguez told them that NCP's earnings would come from the major promoter and not from Cruz's purses.  36:14-17, 239:13-24.

50. Rodriguez says that he told them, and they agreed, that he would get 25% of whatever the major promoter paid Cruz; Rodriguez says that he did not want to put that term in the NCP PA to provide "flexibility."  380:13.

### C.  The BPA (dated May 4, 2023)

51. From November 2022 through March 2023, Rodriguez reached out to several major boxing promoters, as the parties had contemplated.  381:21–386:21.

52. He eventually entered into serious negotiations with Frank Smith of Matchroom, which

United States District Court
Northern District of California

culminated in the BPA.  386:22–387:4; 395:21–398:23.

53. The BPA recites that it "is made between" Matchroom and NCP "for the professional boxing" services of Cruz.  Exh. 2 [Dkt. No. 125].

54. The BPA refers to NCP as the "Promoter" and Cruz as the "Fighter."  Exh. 2 at 1. Matchroom, NCP, and Cruz are further defined at the outset of the BPA "hereafter, each a 'Party' and collectively, the 'Parties.'"  *Id.*

55. The preamble of the BPA states: "This Agreement will set forth and confirm the understanding and agreement the Parties hereto have reached concerning the Fighter's and Matchroom's responsibilities and obligations to one to the other.  For clarity, this Agreement shall supersede and replace any prior agreement or understanding (whether written or oral) between the Parties."  *Id.*; 306:18-20.  There was no prior agreement between the "Parties," defined as Matchroom, NCP *and* Cruz.

56. The commercial terms of the BPA were negotiated between Rodriguez and Smith. 449:23-25; 261:22-25; 262:10-18; 397:14–398:3.

57. Attorney Pat English also represented NCP in the transaction.  Exh. 9 ¶ 9; 397:20-24; 450:1-3.  Cruz was not represented by an attorney.  450:4-7.

58. Prior to execution of the BPA, Cruz did not directly communicate with anybody from Matchroom or with Rodriguez about the agreement, which became effective on May 4, 2023, when all the parties had signed.  Exh. 9 ¶ 7; Exh. 2; 246:4–247:3.

59. Matchroom used one of its base agreements as the template for the BPA.  311:20–312:19; 450:1-3.

60. Matchroom obtained the assignment of NCP's promotional rights for Cruz for a three-year term in the BPA.  *Id.* at 3 § 3.1; 305:12–307:13.

61. It agreed to pay a total signing bonus of $250,000 to "Promoter/Fighter" to an account designated by Promoter.  Exh. 2 at 4 § 5.1.

62. It also agreed to pay purses of $125,000, $150,000, $175,000 and $200,00 for Cruz's first four bouts, respectively. *Id.* at 5 ¶ 6.1; Exh. 9 ¶ 11.

63. Purses were to be payable to the "Promoter and as directed by the Promoter, to Fighter." *Id.* at 6 § 8.22.

64. NCP received funds on Cruz's behalf pursuant to the BPA. There is disagreement on why that is the case. Cruz and his managers claim that payment was made from Matchroom to NCP under the BPA because Cruz did not have a U.S. bank account at that time. 43:3-8; 191:3-14. Rodriguez stated that Cruz's lack of U.S. bank account is not the reason the money was sent directly to NCP. 484:11–485:14. Matchroom did require that Cruz's payments go to a U.S. bank account; Rodriguez filled out the forms to use NCP's account. Exh. 10 [Dkt. No. 125]. Once Sanchez had obtained legal residency in the United States in May 2023, he felt comfortable with the idea of obtaining funds in his U.S. bank account on behalf of Cruz, but felt no need to change the payment structure at that point because he "thought that everything was clear and that it wasn't necessary." 104:4–107:23.

65. There are other terms of the BPA that the parties discussed at trial. The BPA provides that "Matchroom shall make available at Promoter/Fighter's request for use by the Fighter and his trainers up to five (5) hotel rooms", and that "Fighter shall be entitled to receive free of charge four (4) P1, four (4) P2 and four (4) P3 tickets for each bout." *Id.* at 6–7 § 10. The fight tickets, travel, accommodations, and co-branding privileges in the BPA are standard terms in any Matchroom agreement. 300:13–301:15.[5]

66. The BPA includes the following provision: "This Agreement contains the entire

---

[5] Cruz asserts that these provisions constitute NCP's consideration for entering into the BPA. These incidental benefits are hardly sufficient compensation for NCP's services in finding Matchroom and negotiating the BPA, and it was never discussed as such by the parties.

agreement and understanding of the Parties relating to the subject matter of this Agreement and extinguishes all previous agreements, promises, assurances, warranties, representations and understandings between the Parties, written or oral."  Exh. 2 at 15 § 22.1.

67. There is no prior contract involving NCP, Cruz, and Matchroom, who are the defined Parties of the BPA, so that provision does not extinguish the NCP PA.  260:1-4.

68. The BPA also provides that: "The Promoter and Fighter acknowledge that in the event the Promoter is no longer able to provide the professional boxing services of the Fighter in full satisfaction of its obligations pursuant to this Agreement, that the Fighter shall provide his services directly with Matchroom in full satisfaction of the Fighter's obligations pursuant to this Agreement and this Agreement shall be deemed to be between Matchroom and the Fighter."  Exh. 2 at 2–3 § 2.5.

69. Following expiration of the three-year term of the BPA, there is a Negotiation Period of 30 days during which NCP is obligated to negotiate with Matchroom and is prevented from talking to any other promoter.  Exh. 2 at 3 § 3.3.  NCP/Cruz can seek another promoter after the Negotiation Period.  *Id.*; 303:13–304:9.  Paragraph 3.4 states that NCP will maintain Cruz's promotional rights following the expiration of the BPA and obligates NCP to disclose any Third-Party Offer.  Exh. 2 at 3 § 3.4.

70. Importantly, there is no provision in the BPA specifying how NCP is to be compensated for any services or for its assignment of the promoters' rights.  Rodriguez never requested a finder's fee or payment from Matchroom for bringing Cruz to Matchroom.  263:15–264:2.

### D.  The Compensation Conundrum

71. As noted, there is no provision in the NCP PA or BPA that specifies compensation for NCP.  380:7–381:4.

12

72. Smith assumed that Cruz and NCP would have their own agreement on how to split compensation between themselves.  267:24–268:7.

73. Cruz believed that if NCP assigned its promotional rights to a major promoter, NCP would be compensated by the major promoter and not by funds owed to Cruz by the major promoter.  239:18-24; 336:24–337:4; 337:24–338:4.

74. Rodriguez testified that he discussed with Ferrer or Sanchez at least ten times that NCP would receive 25% of Cruz's signing bonus and first year purses under the BPA, but that any percentage of purses thereafter was undecided and would be negotiated thereafter.  372:2-12; 380:7–381:4; 398:24–399:12; 405:24–408:25; 480:18–482:1.

75. Cruz and his managers deny that there was ever such an agreement; there is nothing in writing to this effect.  40:11-25; 153:17-20; 324:1-18.

76. Sanchez says that there was a different oral agreement between him and NCP: NCP would get half of Sanchez's share of the signing bonus and Rodriguez would give Sanchez half of the commission from the promoting companies.  56:23–59:23; 153:20–154:22; 205:4-10.

77. Cruz was not involved in that alleged arrangement and did not authorize it.

78. Cruz resides a great deal of trust in Sanchez.  325:15-17.  Sanchez extracted him from Cuba.  He was responsible for keeping track of all payments from NCP to Cruz.  325:3-17; 124:16-23; 164:1-6.  Cruz's practice was to have Sanchez verify each document he received relating to Cruz's boxing career, explain it to Cruz, and advise him whether to approve the document.  347:1–348:17.

79. At no time did Cruz authorize NCP to withhold money from him in order to satisfy any debt due to NCP or Rodriguez from his managers.  462:24–463:19.

80. In fact, under the Management Agreement, the managers did not have permission to sign a contract or enter into a verbal contract on Cruz's behalf.  29:17-23; Exh. 1.

81. Sanchez and Rodriguez each testified to a series of other agreements and loans between them.  55:6–56:25; 459:12–460:8.

82. While it is unclear what, if anything, Sanchez and Rodriguez agreed to regarding NCP's compensation under the NCP PA or BPA, it is clear that Cruz understood that he was entitled to all of the sums payable under the BPA, from which he would pay his managers, Sanchez and Ferrer, one-third.

83. Cruz understood that Rodriguez and NCP would cut their own deal with Matchroom.

84. The BPA does not contain any provision specifying that NCP would receive 25% of the money paid by Matchroom.  449:16-22; Exh. 2.

85. Rodriguez never told his own lawyer or Frank Smith that the BPA needed to include a term specifying 25% payment of all funds therein to NCP.  451:14–452:11.

86. Rodriguez says that he did not include NCP's 25% compensation in any agreement because "We wanted to leave it kind of open," to "have flexibility."  380:7–381:4.

87. He says that he explained this at the breakfast when the NCP PA was signed and over the phone to Cruz before signing the BPA.  406:23–407:5.

88. He did not think he needed to write down the agreement because he had a compensation arrangement with Cruz in the NCP PA ($25,000 each for three bouts).[6]  407:9-25; 408:1-8, 505:23–506:8.

89. That is not what Cruz, Ferrer, or Sanchez understood from Rodriguez.  "We spoke all along that he was going to receive the money from the big promotional companies and not from Andy's purse," Ferrer testified.  211:22–212:1.  Cruz said that Rodriguez told him that "[h]is earnings had nothing to do with my purse."  239:13-24.

---

[6] Rodriguez apparently thought the NCP PA would control his compensation if the oral agreement was not reached.  Under this interpretation, if a bout purse was $125,000, NCP would be obligated to pay Cruz only $25,000 and NCP could retain the remainder.

Because of the disagreement over this critical term, I allowed extrinsic evidence (as urged by Rodriguez) to see how Matchroom's payments under the BPA were divided in practice in the hope that it would clarify matters. I recite the evidence below. Ultimately, it does not help in further clarifying the legal rights and obligations of the parties; it underscores the dispute instead.

90. From the $125,000 partial payment of the initial Signing Bonus from Matchroom, NCP paid Sanchez approximately 75% ($94,000) as Cruz's share. 416:5-11; *see also* Exh. 5.

91. Prior to payment, on May 11, 2023, Rodriguez and Sanchez disagreed about the amount to which NCP was entitled from that payment. Exh. 107 at 6; 413:11–416:4.

92. As they discussed the amounts to be deducted from the partial payment, Rodriguez wrote, "Brother and what about my percentage?" Sanchez responded in part, "I have a very good memory and we agreed that I would take out my investment and we would divide the rest when I asked you how much you felt comfortable with." Exh. 107 at 6. Rodriguez replied, "But that was not what we had arranged. From the total amount of the money, first the 25% is taken out for the promotion. The rest goes to Andy from which the percentage for management is given to him. That was what we agreed." *Id.* at 7; Exh. 5 at 1; 120:1-12; 121:9-21; 122:5-24.

93. Sanchez did not continue the argument in writing or further object to this payment or to NCP's promoter fee at that time. 122:19–123:6.

94. The purse for Cruz's first bout under the BPA on July 15, 2023, against Juan Carlos Burgos in Detroit, Michigan was $125,000. Exh. 2 at 5 § 6.1(a)(i).

95. After the first bout, Matchroom paid NCP the purse according to a State Bout Agreement ($62,500) and the second portion of the bonus ($125,000). Exh. 9 ¶ 19(i); 155:18–157:13.

96. Rodriguez provided Sanchez with an accounting that included NCP's promoter fee and

15

initially sent Sanchez $96,100.  Exh. 107 at 14.

97. NCP realized that it did not take into account the taxes withdrawn and that it had overpaid Cruz by $15,350.  422:9–423:12.

98. Rodriguez therefore requested a payment from Sanchez for the overpayment.  *Id.*; Exh. 107 at 14–18.

99. Sanchez did not object to NCP's promoter fee and returned the $15,350 overpayment. Exh. 7 at 22; Exh. 109 at 1–4; 132:24–134:24; 135:14-21.

100. Cruz's second bout under the BPA occurred on December 9, 2023, against Jovanni Straffon in San Francisco, CA.  Exh. 9 ¶ 19(ii).  The purse for the second bout under the BPA was $150,000.  Exh. 2 at 5 § 6.1(a)(ii).

101. Matchroom paid $75,000 directly to Cruz, per the State Bout Agreement.  145:21– 146:25; 426:4–427:13.

102. By that point, Cruz had become worried that NCP was not paying him in full. 425:18–426:13.  He initiated this lawsuit and instructed Matchroom not to pay any monies to NCP.  Exh. 9 ¶ 20.

103. In sum, Matchroom paid NCP a total of $430,750, for the signing bonus and Bouts 1 and 2 under the BPA.  Exh. 9 ¶ 13.

104. Of that amount, NCP paid Sanchez directly $283,470.  *Id.* ¶ 15.

105. NCP paid another $81,140 to Cruz's manager and to attorney Pat English, which it argues should be treated as payments to Cruz.  *Id.*  ¶ 16.

106. There is no signed agreement postdating the BPA that has been executed by both NCP and Cruz.  454:1-18; Exh. 9 ¶ 10.

107. NCP did not sign any of Cruz's bout agreements.  454:19-23.

108. At no point after the execution of the NCP PA did NCP put on a Cruz bout, nor did NCP pay Cruz for his appearance in a boxing match.  444:22–445:12.

16

### CONCLUSIONS OF LAW[7]

Under Florida law, a valid contract requires (1) an offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms. *See Kolodziej v. Mason*, 774 F.3d 736, 740 (11th Cir. 2014). "Whether a contract is oral or written, it is essential that the parties mutually agree upon the material terms." *Holloway v. Gutman*, 707 So. 2d 356, 357 (Fla. Dist. Ct. App. 1998). "So long as any essential matters are left open for further consideration, the contract is not complete . . . ." *Id.* (quoting *Strong & Trowbridge Co. v. H. Baars & Co.*, 54 So. 92, 93 (1910)).

As should be clear from reading the Findings of Fact, there was no mutual agreement on material terms between Cruz and NCP. The NCP PA is not valid because it does not specify the essential terms and lacks consideration. The parties' agreement was not that Rodriguez would promote Cruz, but that he would find a major boxing promoter for Cruz. That purpose is not stated in the NCP PA. Nor is it stated how Rodriguez would be paid for that work, as opposed to bout promotion, which was never contemplated by Cruz but which is the focus of the NCP PA.

Neither party seems to recognize the rights and obligations that flow from those essential facts. The NCP PA served its purpose as the prerequisite for Rodriguez to negotiate with major promoters. But Rodriguez had only promoted one fight in his career and Cruz did not choose him to promote his fights. The NCP PA would be exploitative otherwise: compare the consideration stated for Cruz in the NCP PA (no signing bonus, $75,000 minimum for the first three bouts, a five year term) to that included in the BPA ($250,000 signing bonus, $450,000 for the first three bouts, a three year term). The evidence supports Cruz's reasonable understanding that he only signed the NCP PA because it was the necessary predicate for Rodriguez to negotiate with a major promoter.

---

[7] Florida law governs the NCP PA, and so I apply it to reach the following Conclusions of Law. I recognize that New York law governs the BPA, but it is the deficiencies in the NCP PA that are central to this case. Those deficiencies do not impact the legality of the BPA.

That said, Rodriguez is entitled to compensation for his successful completion of what the parties wanted him to do. He acted as an intermediary to a major boxing promoter. While the NCP PA is not valid, he is entitled to quantum meruit damages for his services. But because the NCP PA is invalid, Rodriguez has no further rights under the BPA.

I discuss the bases for these conclusions of law below.

## I.      CRUZ, SANCHEZ, FERRER, AND RODRIGUEZ MUTUALLY ASSENTED TO NCP ACTING AS AN INTERMEDIARY TO A MAJOR BOXING PROMOTER

When Cruz arrived in the Dominican Republic, met Sanchez, and began speaking about how to jumpstart his professional boxing career, his goal was to find a major boxing promotion company to promote him. While he did not know the ins and outs of the boxing industry, and may not have had a fixed idea of what his value was, he did know that he was at the top of his field and could command significant compensation if partnered with a major boxing promoter. He did not have contacts who could facilitate negotiations with such a promoter, and neither did Sanchez. That is why Sanchez spoke with Ferrer about how to acquire such a partnership and why Ferrer suggested that Rodriguez could help.

Cruz and his wife met Rodriguez for the first time at the dinner on November 7, 2022, with Sanchez and Ferrer. The discussion was social. At breakfast the next day, Cruz signed both the NCP PA and Management Agreement. Little time elapsed to consider the business terms of either contract. With respect to the Management Agreement, Cruz had confidence in Sanchez at least in part because Sanchez had arranged to get Cruz out of Cuba. Sanchez promised to pay him $11,000 per month for eleven months, which would suffice until a contract could be struck with a major promoter and bouts could be scheduled. Sanchez had found Ferrer, who knew the boxing world, to assist him. Cruz knew that the managers' take would be 33% of his bouts and signing bonus, and was comfortable with that arrangement.

Cruz did not have any relationship with Rodriguez prior to November 7, 2022. Once they

18

met, Rodriguez explained to Cruz that he could be an intermediary to the major promoters, given his 15-years experience in boxing. Rodriguez had a business background. He told Cruz that before any major promoter would talk to him, Rodriguez would have to show that he had authority to assign all promotional rights to that promoter. Rodriguez confirmed that the NCP PA would allow him to do that. Ferrer and Sanchez supported hiring Rodriguez/NCP to find and negotiate with a major boxing promoter to get Cruz's professional career off the ground. Cruz agreed, and signed the NCP PA as the essential first step for Rodriguez to start communicating with major promoters.

The parties agree that Rodriguez's compensation was discussed, but disagree about what that compensation would be or how it would be paid. Although Cruz believed Rodriguez would be compensated directly by the major promoter, Rodriguez believed he would be compensated by a portion of Cruz's signing bonus and purses as transferred to him by the major promoter.

Rodriguez relies on the NCP PA as the contract that entitles him to compensation. But its purpose was not that he would actually be Cruz's promoter. He was an intermediary. He did not have the experience, background or resources to promote a boxer of Cruz's prominence. Before working with Cruz, NCP had previously promoted only one fight, and it lost money in doing so. It promised to pay Cruz a minimum of $25,000 for each of three fights and no signing bonus, a clearly insubstantial amount in light of Cruz's talent and pedigree. Instead, the understanding was that Rodriguez was to devote his efforts to securing a major promoter, not to promote bouts for Cruz. He needed to have Cruz's promotional rights in hand in order to negotiate with the major promoters. He found the promoter with the NCP PA. That is what he was asked to do, why he needed the NCP PA, and what he accomplished.

## II.    THE NCP PA IS NOT A VALID CONTRACT AND IS UNENFORCEABLE

As discussed, the NCP PA lacks consideration and fails to specify essential terms. There was no oral contract either because the parties never agreed on NCP's compensation. There was

mutual assent that Rodriguez would work as an intermediary to find a major promoter and negotiate a contract with that promoter for Cruz's benefit, however, and Rodriguez is entitled to quantum meruit damages, as I discuss in the next section.

There is no term in the NCP PA that describes how Rodriguez would be paid for his actual work of finding the major promoter. Rodriguez claims that he had an oral agreement prior to execution of the NCP PA that he would receive 25% of whatever the major promoter was to pay Cruz, but he chose not to reduce this alleged agreement to writing. It is possible that all parties are telling the truth but that there was a misunderstanding about what Rodriguez meant. Perhaps he described to Cruz and Sanchez that he would get paid through the promoter and that Cruz would not have to pay him out of pocket following the ultimate transaction from Rodriguez to Cruz, but Cruz and Sanchez understood that Rodriguez would not be taking *any* money designated for Cruz (including the signing bonus or bout payments) and Rodriguez would have a separate agreement for compensation with the major promoter.

That still leaves unanswered why Rodriguez failed to write down his understanding of the purported agreement. His explanation that he wanted flexibility to reduce the purported 25% rate later if circumstances allowed does not make much sense. There is no writing prior to execution of the two written agreements that evidences that understanding and it is uncorroborated by witness testimony. It seems more likely that Rodriguez realized that what he wanted in compensation was much *more* than what Cruz, who had already committed to pay his managers 33% of his boxing-related revenue, would be willing to give. Rodriguez was not ultimately going to promote Cruz—a promoter, as the Ali Act defines, is one who primarily promotes a professional boxing match, and Rodriguez was never going to do that for Cruz (and never did). 15 U.S.C. § 6301(9). The idea that Cruz would have allowed another 25% of his earnings go to Rodriguez would have been a nonstarter.

I do not have to resolve why Rodriguez acted as he did. Whatever the reason, Rodriguez

was by far the most experienced and sophisticated party involved in the drafting and signing of the NCP PA.  The contract was prepared by his attorney.  He had used these form contracts before with other boxers.  No other party was represented by an attorney before signing the NCP PA.  If there is any ambiguity in the NCP PA, it must be construed against Rodriguez.  He had the opportunity in the NCP PA and later in the BPA to spell out NCP's entitlement to a certain amount of compensation for its services, and he did not do so.  The NCP PA fails because there was no agreement regarding Rodriguez's compensation or to the essential terms of the agreement with Cruz.  *See Kolodziej*, 774 F.3d at 740.

### III.    RODRIGUEZ IS ENTITLED TO QUANTUM MERUIT DAMAGES

Quantum meruit, or a contract implied-in-fact, is an equitable doctrine, applicable when there is no express (i.e. valid) contract, but there is clear agreement between the parties.  To recover under a quantum meruit theory, a party must demonstrate that the "the plaintiff provided, and the defendant assented to and received, a benefit in the form of goods and services under circumstances where, in the ordinary course of common events, a reasonable person receiving such benefit normally would expect to pay for it.  *F.H. Paschen, S.N. Nielsen & Assocs. LLC v. B&B Site Dev., Inc.*, 311 So. 3d 39, 48 (Fla. Dist. Ct. App. 2021) (quoting *W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc.*, 728 So. 2d 297, 305 (Fla. Dist. Ct. App. 1999)).  It requires the assent of the parties.  *Tipper v. Great Lakes Chem. Co.*, 281 So. 2d 10, 12 (Fla. 1973).  It imposes liability "based on a tacit promise, one that is inferred in whole or in part from the parties' conduct, not solely from their words."  *Commerce P'ship 8098 Ltd. P'Ship v. Equity Contracting Co., Inc.*, 695 So. 2d 383, 385 (Fla. Dist. Ct. App. 1997).  "A contract implied in fact is not put into promissory words with sufficient clarity, so a fact finder must examine and interpret the parties' conduct to give definition to their unspoken agreement."  *Id.*

Here, Cruz and Rodriguez agree that the purpose of the NCP PA was to allow Rodriguez to find Cruz a major promoter.  239:13-24; 240:7-15; 243:6–244:2; 244:23–245:8; 372:21–374:6;

United States District Court
Northern District of California

376:23–377:11; 379:16–380:9; 398:16–399:12.  Rodriguez performed by securing an agreement with Matchroom for Cruz in 2023.  Stipulated Facts ¶ 7.  Rodriguez "provided, and [Cruz] assented to and received, a benefit in the form of" Rodriguez finding Cruz a major promoter.  *F.H. Paschen*, 311 So. 3d at 48 (2021) (citations omitted).  While there is no express contract between Cruz and NCP, see *supra* Conclusions of Law Part II; Dkt. No. 84-2; 407:4–25, that does not mean that he is not entitled to compensation.

There is limited Florida case law on point for quantum meruit where there is intent to enter an agreement without specification of compensation.  The parties have pointed to no useful caselaw on this point in their proposed conclusions of law.  *See* Dkt. Nos. 134, 135.  Most cases involve a contractor and subcontractor with an express contract to perform a certain set of duties and a side oral agreement to perform additional duties, but where the scope of the additional duties is unclear and there is no agreed upon compensation for those additional duties.  *See generally F.H. Paschen*, 311 So. 3d 39 (2021); *Daake v. Decks N Such Marine, Inc.*, 201 So. 3d 179 (Fla. Dist. Ct. App. 2016).

I have located one case that is on point: *Solutec Corporation v. Young & Lawrence Associates*.  243 So. 2d 605 (Fla. Dist. Ct. App. 1971).  *Solutec* concerned an individual who performed various services for a company but was never paid.   He had proposed to perform those services for a fixed retainer plus commission for any sales, but his offer was never accepted.  *Id.* The parties never reached an agreement for his compensation in writing, but the plaintiff still performed the services.  *Id.* at 606.

At trial, the jury found that the plaintiff was entitled to recover quantum meruit damages, the reasonable value of his services, because while there was no express agreement for compensation, there was clear assent of the parties for the work to be done.  *Id.*  On appeal, the company claimed that the plaintiff was not entitled to compensation that was "not implied by the circumstances to have been agreed upon by the parties," but the appeals court held that argument

contradicted the theory of quantum meruit because there was no agreement to any specific compensation. *Id.* The appellate court affirmed the jury verdict of $40,000 for the plaintiffs. *See* Trial Ct. Judgment, *Young & Lawrence v. Solutec Corp.*, No. 68-1710.

Here, the facts follow *Solutec*. Inferring "from the parties' conduct," the parties clearly assented to Rodriguez performing the work of being an intermediary to a contract with a major promoter. *Commerce P'ship*, 695 So. 2d at 385. But there was never any agreement, including in the NCP PA, on how or how much he would be paid. As in *Solutec*, Rodriguez is entitled to the reasonable value of his services. So. 2d at 606. What that amount is will be decided by a jury.

## IV.    BECAUSE THE NCP PA IS INVALID, NCP HAS NO RIGHTS UNDER THE BPA

Rodriguez succeeded in the task to which there was assent: he found Matchroom and negotiated an agreement for Cruz's benefit. But because the NCP PA is invalid, NCP has no rights as a promoter for Cruz under the BPA, and only has rights to compensation to the extent of its quantum meruit damages. In this circumstance, paragraph 2.5 of the BPA states that "in the event the Promoter is no longer able to provide the professional boxing services of the Fighter in full satisfaction of its obligations pursuant to this Agreement, that the Fighter shall provide his services directly with Matchroom in full satisfaction of the Fighter's obligations pursuant to this Agreement and this Agreement shall be deemed to be between Matchroom and the Fighter." Exh. 2 at 2 § 2.5. Cruz, therefore, retains his rights and obligations under the BPA.

### CONCLUSION

For the foregoing reasons, the NCP PA is not a valid contract and is void. Quantum meruit is appropriate for Rodriguez for the reasonable value of his services in securing the BPA for Cruz.

These conclusions have significant ramifications for the pending causes of action in Cruz's Third Amended Complaint and NCP's Amended Cross-Complaint, including those which I have

already addressed in the Prior Order.[8]  I will set a Case Management Conference for December 2, 2025, at 2:00 p.m., with the Joint Statement due on November 25, 2025, to discuss these and other outstanding issues.  The parties, including Matchroom, shall meet and confer and propose, separately or jointly, a trial schedule for the remainder of the case, and identify and address any disagreements about the implications of this Order.

**IT IS SO ORDERED.**

Dated: November 5, 2025



William H. Orrick
United States District Judge

---

[8] For example, in the Prior Order, I held that there was no dispute that NCP violated the promoter's disclosure obligation under the Ali Act.  Prior Order at 13–15.  However, if the NCP PA is invalid (as I now conclude it is), then NCP could not be found in violation of that provision of the Ali Act because it was not Cruz's promoter.  Testimony at trial also suggested that only the promoter who promotes a bout has the disclosure obligations under the Ali Act, and there is no dispute that Matchroom, rather than NCP, has promoted Cruz's bouts.